SIMMONS NATIONAL BANK v. DALTON.

5-2164                                          337 S. W. 2d 667

Opinion delivered June 6, 1960.

[Rehearing denied September 12, 1960]

*Coleman, Gantt & Ramsay, E. Harley Cox, Jr.,* for appellant.

*George Howard, Jr.,* for appellees Daltons; *Carlton Currie,* for appellee Universal C. I. T.

PAUL WARD, Associate Justice. One of the principal questions presented on this appeal is whether there was a novation which discharged the maker of a note. The other question involved is whether certain transactions created a constructive trust. The trial court held that there was a novation but that there was no constructive trust. Appellant seeks a reversal on both questions.

The factual background out of which these questions arise is substantially as presently set forth.

On December 21, 1956 Ulysses G. Dalton, III, and his wife, Helen, (hereafter sometimes referred to merely as Dalton) purchased a 1957 Model Ford car from N. F. Trotter, executing to Trotter a conditional sales contract and also a note payable in monthly installments of $70.24 — the last payment falling due August 5, 1959. The contract and note were purchased by appellant, The Simmons National Bank of Pine Bluff. On December 19, 1957 Dalton's car was involved in a collision with another car near Beebe, Arkansas, resulting in considerable damage to Dalton's car. The record discloses that the insurance carrier on the other car involved paid $750.00 for the damage done to Dalton's car. A few days after the collision Dalton traded his wrecked 1957 Ford for a new 1958 Ford (sales price of the new Ford being $3,180,000) with Guy Thompson who was at the time a Ford dealer at Beebe. In accordance with the trade agreement between Dalton and Thompson the latter received the $750.00 insurance payment heretofore mentioned, the wrecked 1957 Ford (valued at $2,180.00) and a note (with the conditional sales contract executed by Dalton to Thompson) in the amount of $2,400.00 payable in equal monthly installments. In addition, and as a part of said trade agreement, Thompson agreed with Dalton that he would pay the balance (amounting to approximately $1,400.00) due appellant by Dalton on the

note and conditional sales contract heretofore mentioned. Thompson transferred, with recourse, to the Universal C.I.T. Credit Corporation (hereafter referred to as "C.I.T.") the $2,400.00 note and conditional sales contract and received from C.I.T. a check for the full amount of $2,400.00.

Early in January 1958 Thompson mailed appellant a check for the balance due on the said Dalton note but about a month later appellant returned the check to Thompson (uncashed) because Thompson had asked to have the title to the 1957 Ford attached to the check and appellant did not have the title in its possession. It appears from the record that Dalton had not paid the sales tax on the 1957 Ford and consequently the Revenue Department of this State had not issued to him the said title. While appellant was holding Thompson's check it notified Dalton about the absence of the title to the 1957 Ford and asked him to obtain same. Dalton made an effort to obtain a title certificate from the Revenue Department but for some reason failed to do so — and that was when appellant returned the $1,400 check to Thompson.

Following the above Thompson made three or more payments to appellant on the Dalton note but he did not make sufficient payment to keep the monthly payments current. Appellant in an effort to get Thompson to make regular payments on the note wrote him some nine or ten letters beginning on January 6, 1958 and ending on October 22, 1958. On or about the last mentioned date, when it became fully apparent to appellant that Thompson was insolvent and that he was not going to continue making payments on the note, it so informed Dalton, and it also told Dalton at that time that it was looking to him to pay the balance due on the note. Dalton, however, informed the Bank that he did not consider himself bound on the note for the reason that Thompson had agreed to pay it and thereupon appellant instituted this litigation.

In its Complaint in the Circuit Court appellant sought judgment not only against Dalton and his wife in

the sum of $1,109.36, with interest, (the balance due on said note), but also asked that Dalton and the Credit Corporation "be made trustees to the extent of the aforesaid judgment of the 1958 four door Ford sedan" then in the possession of Dalton. Dalton filed a Cross Complaint, making Thompson a party defendant, and asked for judgment against him and C.I.T. C.I.T. entered a general denial and stated that it was a *bona fide* purchaser of the note and conditional sales contract executed for the purchase of the 1958 Ford. The cause was transferred to the Chancery Court.

After a hearing the Chancellor decree that there was a novation and relieved Dalton of all liability on the note, but refused to hold C.I.T. and Dalton, or either of them, liable to appellant as trustees. The Chancellor also dismissed Dalton's Cross Complaint against Thompson and C.I.T. On appeal appellant contends (a) that the trial court erred in failing to hold C.I.T. and Dalton as constructive trustees, and (b) that it was error to release Dalton from the indebtedness.

*Constructive Trust.* In our opinion the Chancellor correctly refused to hold Dalton and C.I.T. liable to appellant as trustees. Apparently appellant concedes, as well it may, that neither of the above named parties was guilty of participating in any fraudulent transaction even though they both knew at the time the 1958 Ford was purchased that Dalton owed a balance on the 1957 Ford to the Bank. This is true because Dalton had a legal right to sell and Thompson had a legal right to buy or trade for the 1957 Ford without the knowledge or consent of appellant. See *Dedman* v. *Earle,* 52 Ark. 164, 12 S. W. 330, and *Fairbanks, Morse & Company* v. *Parker,* 167 Ark. 654, 269 S. W. 42. However, appellant says, citing authorities, that fraud is not always a necessary basis out of which a constructive trust relationship may arise. Even so, the cited authorities are of no avail to appellant under the facts of this case. Appellant relies on 89 C. J. S., Trust, Section 142, Page 1027, and also Restatement of the Law of Restitution, Section 160, Page 640, for authority that Dalton and C.I.T. hold funds

which in equity and good conscience belong to it — the appellant — and that C.I.T. will be unjustly enriched if it is not held to be a trustee. We fail to see how this result would follow. Neither Dalton or C.I.T. has in any way impaired appellant's security or imperiled its position — it still had Dalton on the note and it had a right to repossess the 1957 Ford. See *Olson* v. *Moody, Knight & Lewis, Inc.,* 156 Ark. 319, 246 S. W. 3, and the cases cited therein. It is not denied that C.I.T. paid $2,-400.00 for the note and conditional sales contract given by Dalton to Guy Thompson and we know of no theory, under the facts of this case, that would constitute it a constructive trustee in favor of appellant. The same thing can be said in behalf of Dalton who legally purchased, for value, the 1958 Ford which he now has possession of. Nor do we agree with appellant that C.I.T. became a trustee in favor of appellant because it had knowledge that the $750.00 (paid by the insurance company for damage to Dalton's 1957 Ford) was paid to Thompson as part of the purchase price for the new 1958 Ford. Even if it be conceded, as we do not here concede, that notice of the above facts would constitute C.I.T. as a trustee, we fail to find anything in the record to show that C.I.T. had such knowledge. No one testified to that fact and it was not shown on the conditional sales contract which C.I.T. purchased.

*Novation.* After careful consideration we have concluded that the trial court erred in holding that there was a novation, thereby relieving Dalton (and his wife) from the obligation to pay the note held by appellant. The learned Chancellor held, and it seems to be conceded by everyone, that there was no such novation at the time Dalton purchased the new 1958 Ford. It is undisputed that Thompson did agree to assume the debt to appellant but it is not conceded by anyone that appellant knew of this agreement much less that it consented to release Dalton when the trade was made. Therefore, it must be assumed that if any novation occurred it took place later during the year 1958. The record fails to show, and Dalton does not even contend, that appellant at any time expressly agreed with Dalton that it would

release him from the debt and look solely to Thompson for payment.

The learned Chancellor, however, took the view, and correctly so, that it was not necessary for appellant to expressly agree with Dalton that he would be relieved of liability and that he would look solely to Thompson, but that such agreement and intent on the part of appellant could be inferred from appellant's actions. We do not agree, however, that such an inference is tenable under the facts of this case.

Let us take a look, therefore, at the record to see what appellant did and what transpired with reference to its dealings with Thompson and Dalton. Appellee Dalton lays much stress on the fact that appellant made an effort to collect from Thompson and it must be conceded that appellant did just that. Early in January 1958 (only a few days after Dalton traded cars with Thompson) Thompson mailed the $1,400.00 check to appellant with instructions to cash it only if the title to the 1957 Ford was attached. Appellant did not have said title, but it contacted Dalton and advised him of the situation. Appellant also, on January 10, 1958, wrote Thompson about the absence of the title, stating that they were informed that the sales tax had never been paid. In the letter appellant also stated that it had talked with Dalton about the matter and that Dalton was going to Little Rock to see about it. Again on January 23, 1958 appellant wrote Thompson that it had talked with Dalton that day and that Dalton was going to take the necessary papers to Little Rock the next day and that Dalton would let it know the outcome of his visit. On February 14, 1958 appellant wrote Thompson, returning his check, and stated that it was unable to secure the said title and also stated that there was a balance of $1,318.15 due on the Dalton note. The letter also advised Thompson that it was unwilling to continue carrying the account under the conditions without further payment. On March 5, 1958 appellant wrote Thompson another letter to the same effect. On March 28, 1958 appellant again wrote Thompson that "we will

expect you to pay U. G. Dalton's car in full as soon as possible". On May 2, 1958 appellant wrote Thompson to "please send another remittance on the account of Dalton". On May 19, on August 5, and October 22, 1958 appellant wrote Thompson urging him to make payment.

The only two witnesses who were in position to testify relative to whether appellant Bank released Dalton from his obligation were W. E. Ayers, Assistant Cashier of appellant Bank, and Dalton himself. The relative portions of their testimony not heretofore mentioned are substantially as set out below.

Ayers was asked if there was any contact whatever with Dalton in regard to the delinquency of his account. He replied:

A. "Yes, on several occasions. I talked with him by 'phone and later he came to our office."

Q. "What was the nature of these conversations?"

A. "Briefly, it was to determine if he knew the reason for the delay in the title reaching our office, and if he knew any reason why it was being held up and *also informed him that it was his responsibility to see that the account was paid in full.*" (Emphasis supplied.)

Q. "Did he try to assist you in collecting this account."

A. "Yes, it is our policy to assist our customers in any way we can, and naturally we followed that pattern in this case, agreeing to assist him in any way we could, *at the same time indicating that so far as our records were concerned, the obligation was his.*" (Emphasis supplied.)

Q. "Did you ever indicate to Ulysses G. Dalton he was no longer liable on this account?"

A. "No."

On Cross Examination:

Q. "In reply to your attorney's question whether or not you had any understanding with defendant Dalton regarding this unpaid balance, you stated it was the policy of the Bank to assist the customers. Did you have any other understandings? What was the discussion had between you and Dalton regarding this account and payment of it?"

A. "Briefly, the discussion boiled down to this: *So far as our records were concerned the obligation was U. G. Dalton's."* (Emphasis supplied.)

Dalton's testimony:

Q. "Did you receive any oral demands from The Simmons National Bank regarding the balance due?"

A. "I don't think in the form of a demand. I did talk to them and they referred to the balance, but not in the form of a demand."

Q. "Did they specifically ask you to make this payment at this time?"

A. "They didn't specifically ask me to make the payment, but asked if anything could possibly be worked out, and I told them I assumed Mr. Thompson would take care of it."

Q. "When was the last time they checked with you by 'phone regarding this matter?"

A. "I think it was the month of May or June, by 'phone."

Q. "Did you have any arrangements with the Bank to the effect they would collect it for you?"

A. "Not for me. I assumed it was his (Thompson's) obligation to pay it; I was relieved of it."

Q. "Were you not advised at that time the balance would have to be paid by someone primarily liable?"

A. "I was told it would have to be paid in order to clear your books, and you said you held me responsible, and I did mention to you that I did not feel I was obligated."

Q. "Did you ever state to me (the Bank's attorney) you didn't feel you were obligated?"

A. "I stated that Mr. Thompson assumed the obligation to pay it off, at which time you mentioned I might consult a lawyer."

Referring to the time when the automobile trade was made the witness was asked:

Q. "At that time you knew you were indebted to The Simmons National Bank?"

A. "Yes, sir."

Q. "You knew they were holding retaining title on the vehicle?"

A. "Yes, sir."

Q. "Did you notify the Bank of the collision?"

A. "I didn't."

Under the above factual situation we can see nothing, even in Dalton's testimony, from which it can be legally inferred that appellant Bank agreed to or intended to release Dalton from his obligation on the note. Neither is there anything in Ayers' testimony, or in the numerous letters referred to above, from which it could be presumed that the Bank would in fact release Dalton. It appears conclusively to us, as it was stated by appellant's employee, that what the Bank did amounted to nothing more than an effort to accommodate Dalton in its efforts to have Thompson pay Dalton's debt. In this the Bank's actions were in no way inconsistent with its intention to have Dalton remain liable on the note. In the case of *Elkins* v. *Henry Vogt Machine Company*, 125 Ark. 6, 187 S. W. 663, where the facts were somewhat similar to the facts here, the appellee company brought suit on three promissory notes signed by Elkins and others. The notes were given for machinery to be used in the erection of an ice plant owned by Elkins, et al. Elkins alleged that they had sold their interest in the machinery to C. C. Edwards, et al, with the understanding that they (Elkins, et al) were to be relieved from the pay-

ment of the note and that for a valuable consideration, consisting of the execution of a mortgage, to secure the payment of the indebtedness, and that the appellee Company released them from all liability. In that case this Court quoted with approval from 29 Cyc. 1130: "It is not essential that the assent to and acceptance of the terms of the novation be shown by express words to that effect, but the same may be implied from the facts and circumstances attending the transaction, and in the conduct of the parties thereafter. *Such consent is not to be implied merely from the performance of the contract by the substitute, for that might well consist with the continued liability of the original party* . . ." (Emphasis supplied.)

In a case of this kind the burden was on Dalton to show that he had been released by appellant Bank. In *Brewer & Son* v. *Winston, Ad.,* 46 Ark. 163, it was so held. Brewer & Son brought an action against appellee Winston on a promissory note and recovered judgment before a Justice of the Peace. Winston appealed to the Circuit Court where he filed an answer stating that he had sold his equity of redemption in the mortgaged premises to a person by the name of Elliott who had assumed the debt as part of the purchase price, and that Brewer & Son had consented to accept Elliott as their debtor and to release the defendant Winston. The cause was tried in equity and a decree entered in favor of Winston. On appeal the Court stated the facts to be substantially as follows: The mortgaged premises had a grist mill on them valued at $325.00. Elliott was willing to purchase at the price, provided he was not pressed by the mortgage creditor whose debt was already past due; Brewer & Son assented to this arrangement — they were willing to receive payments from Elliott and give credit to Winston therefor but refused to give up Winston's note and take Elliott's note in lieu thereof; Winston swore that Brewer & Son consented to accept Elliott as their debtor and to release the original debtor, but Brewer and Elliott contradicted him. This Court in reversing the judgment of the trial court said: "But the judgment was wrong upon the merits. The burden was

upon the defendant to prove that he had been discharged by a novation of the contract." This statement relative to the burden of proof has been approved in many other decisions of this Court.

Our decisions and the text-writers appear to be uniform in holding that it is necessary to show an *intent* on the part of the creditor to release an old debtor and substitute therefor a new debtor. In *Home Life Insurance Company* v. *Arnold,* 196 Ark. 1046, 120 S. W. 2d 1012, this Court, in dealing with this same question, said: ". . . the effect of the novation is the *intention* of the parties." (Emphasis supplied.) Likewise, at Pages 266 and 267 of Volume 39 Am. Jur., it is stated, among other things, that: "In order to effect a novation there must be a *clear and definite intention* on the part of *all* concerned that such is the purpose of the agreement." (Emphasis supplied.) In Williston on Contracts, Volume 6, Revised Edition, at Page 5254, Section 1870, under the sub-title *"Necessity for the assent of all parties to a simple novation"* it is stated: "It is undoubtedly a *commonplace* in the discussion of novations that the *assent* of all parties is necessary; and certainly . . . no old debtor can be discharged without the creditor's consent, . . ." (Emphasis supplied.) Numerous cases therein are cited sustaining the above announcement.

In this case we are driven to the conclusion that Dalton did not, by his testimony, or the testimony of anyone else, discharge the burden which the law places upon him, and further that there is insufficient testimony to establish a clear and definite intention, or for that matter any intention at all, on the part of the appellant Bank to discharge Dalton from his obligation on the note. This conclusion is further substantiated by the concession of both parties and by the judgment of the Chancellor that there was not any novation at the time Thompson agreed to pay Dalton's debt to this Bank, and by the undisputed proof that appellant did not know at the time of the arrangements made between Dalton and Thompson. If there was not any novation at that

time then it would be interesting to speculate as to when the novation occurred. It is impossible it seems to us to fix such time under the record in this case. It follows, therefore, that the Chancellor erred in dismissing appellant's Complaint against Dalton and to that extent the decree must be reversed.

Since the trial court held that Dalton was not liable, it then consistently held that Dalton had no right of action against Thompson and thereupon dismissed Dalton's Cross Complaint. Since we are holding Dalton liable the cause must be remanded with directions that Dalton's Cross Complaint against Thompson be reinstated.

The decree of the Chancellor is affirmed in part and reversed in part as heretofore indicated, and the cause is remanded with directions to enter a decree in accordance with this opinion.

Affirmed in part, reversed in part and remanded with directions.

HARRIS, C. J., not participating.