DOUGLAS–GUARDIAN WAREHOUSE CORPORATION, Plaintiff,

v.

Archie T. NICKELL, Defendant.

Civ. A. No. 1739.

United States District Court
W. D. Arkansas,
Fort Smith Division.

Dec. 22, 1964.

Bethell & Pearce, Fort Smith, Ark., Hemry & Hemry, Oklahoma City, Okl., for plaintiff.

Harper, Harper, Young & Durden, Fort Smith, Ark., for defendant.

JOHN E. MILLER, Chief Judge.

In this action commenced August 22, 1963, the plaintiff, Douglas-Guardian Warehouse Corporation, a Louisiana corporation, with its principal place of business at New Orleans, hereinafter referred to as plaintiff, seeks to recover $19,611.87 from the defendant, its bonded warehouseman, Archie T. Nickell, a citizen of the State of Arkansas. Juris-

diction exists by reason of diversity of citizenship of the parties and the amount involved. 28 U.S.C. § 1332(a), (1963 Supp.).

It is alleged in the plaintiff's complaint that the defendant, Archie T. Nickell, was the bonded warehouse representative and employee of the plaintiff at the time of the alleged loss and that by virtue of the articles of agreement executed by the parties, defendant agreed to be responsible to the plaintiff for any loss which might be sustained by reason of any misconduct in the operation of a field warehouse at the Ozark Canning Company, at Ozark, Arkansas. It is further alleged that a loss occurred in August 1960, and by reason of the acts of the bonded representative, plaintiff suffered a loss because of improper release of merchandise under warehouse receipts stored in the plaintiff's field warehouse at Ozark Canning Company; that by reason of said shortage plaintiff became liable and paid City National Bank the sum of $27,526.-10, and, after allowing just credits, the defendant is indebted to the plaintiff in the above mentioned sum. (The amount now claimed is $19,511.09.)

The defendant in his answer of September 30, 1963, admitted the jurisdictional allegations in the plaintiff's complaint, but denied that the bond referred to in the complaint was in full force and effect August 30, 1960, and further denied any other substantive allegations with respect to any claim against him. He further asserted that any releases of goods stored in the warehouse were with the full knowledge and consent of the plaintiff and that the plaintiff is estopped to assert any claim against defendant growing out of such conduct. The defendant in his answer also pleaded that a promissory note in writing executed by Ozark Canning Company payable to plaintiff in the face amount of $20,450.41 was full and complete settlement and discharge of any liability of this defendant. This promissory note is pleaded as a complete bar to plaintiff's claim and the defendant in his answer prayed that the complaint be dismissed.

On November 23, 1964, the case was tried to the court, at which time both parties introduced oral and documentary evidence. At the conclusion of the trial the case was submitted and taken under advisement by the court. The parties were directed to submit briefs in support of their contentions, which have been received and the case is now ready for disposition.

In October 1958 the Ozark Canning Company, an Arkansas corporation at Ozark, Arkansas, engaged in the canning of fresh fruits and vegetables, hereinafter referred to as Ozark, approached the plaintiff with the view of establishing a field warehouse at Ozark's plant at Ozark, Arkansas. On October 2, 1958, plaintiff executed an agreement with the defendant, Archie T. Nickell, who was the plant manager of Ozark, whereby plaintiff would establish a field warehouse at the Ozark plant and employ Archie T. Nickell as its bonded representative and field warehouseman. Under the warehouse arrangement a field warehouse was established at the Ozark plant, whereby goods were placed in the warehouse under the custody and care of the bonded representative, Nickell. Nonnegotiable warehouse receipts were issued upon the goods placed in the Ozark warehouse and pledged to the City National Bank of Fort Smith, Arkansas, which advanced up to 75 percent of the retail value of the goods warehoused. After a sale of the goods warehoused, a release would be given by the City National Bank upon the payment of the advance on merchandise sold which was covered by the warehouse receipt.

The field warehouse was audited by representatives of plaintiff on a monthly basis. Ozark, under the warehouse arrangement, had a releasing privilege of $15,000. The releasing privilege allowed Ozark to release goods from the warehouse without warehouse receipts up to a maximum amount of $15,000 retail value. At various times between 1958 and August 29, 1960, the warehouse audits were made by Mr. Earnest G. Logan, a field representative of Douglas-Guardian, and by Mr. Don Steketee.

The audits on three occasions during this two-year period reflected shortages in excess of the $15,000 releasing privilege. The audits of March and July 1960 revealed a small excess above the releasing privilege, and the audit of November 1959 disclosed a substantial shortage in excess of the releasing privilege. The audits in this period reflected that the defendant bonded representative was cautioned with respect to the shortages and the auditor's reports transmitted to the plaintiff recited statements of complaints reported to the storer, Ozark, as to the shortages.

After the discovery of the August 1960 shortage, representatives of plaintiff contacted Mr. George Jones of Spiro, Oklahoma, the President of Ozark, and had a conference at his office at Spiro, Oklahoma, and obtained from Mr. Jones promissory notes and warehouse receipts on free goods [1] to cover the shortages of the field warehouse at the Ozark Canning Company and also the Fresh Canning Company at Spiro, Oklahoma, of which Mr. Jones was also President. Subsequently it was determined that the amount of shortages as reflected by the first set of promissory notes were not properly calculated, and a second set of notes were prepared and eventually signed by Mr. Jones and placed with a Vice President of the City National Bank at Fort Smith, Arkansas. Thereafter, protracted litigation developed between Ozark, Fresh Canning Company of Spiro, Oklahoma, George W. Jones, Douglas-

[1]. "Free" goods in warehousing terminology are those goods which, although placed in a field warehouse, no warehouse receipt has been prepared to cover them and no advance made against the warehouse receipts. By the terms of the warehousing arrangement in the instant case, Douglas-Guardian has a contractual lien against the free goods to apply against any shortage. Thus, it obtained warehouse receipts covering goods over which it, Douglas-Guardian, had a lien.

Guardian, and the Fresh Canning Company's bonded warehouse representative, Bennie Cox, in the federal courts of Oklahoma, and those suits are presently pending.

The plaintiff contends that the defendant is personally liable for the warehouse shortages because of the agreement executed by defendant and plaintiff on October 2, 1958, referred to above, which plaintiff contends imposes liability upon the defendant for any loss sustained by reason of any acts on his part contrary to the warehousing agreement.

The defendant contends that the loss, if any, suffered by the plaintiff is satisfied by a novation resulting from the execution of promissory notes by Ozark and Fresh Canning Companies, and further that any conduct on the part of the defendant which resulted in a shortage was with the knowledge and consent of the plaintiff, and the plaintiff is therefore estopped to assert any claim against the defendant by reason of such alleged conduct.

The articles of agreement between the plaintiff and the defendant with respect to the defendant's obligation as a bonded representative provides that plaintiff would employ defendant at a salary of $500 a month commencing October 7, 1958, and that the defendant, Archie T. Nickell, "shall be on duty as required each week in accordance with instructions received from time to time from Douglas-Guardian Warehouse Corporation." This agreement further provides:

"SECOND: Archie T. Nickell hereby accepts said appointment under the conditions herein recited, and in consideration of the compensation agreed upon does hold himself bound by any and all instructions that shall from time to time be furnished to him by the Corporation, and does hold himself, his heirs, executors, administrators and assigns responsible to the Corporation for any loss which the Corporation may sustain by reason of any and all unlawful acts on his part or by or through his carelessness, negli-

gence, breach of trust, or by reason of his failure fully to comply with such instructions."

In addition to the portion quoted above, the agreement provides that it may be terminated by either party on ten days' notice in writing, and further that plaintiff may terminate it at any time without prior notice for cause. In the "Bonded Representative's Statement and Receipts", portion of the agreement, it states that Archie T. Nickell received possession of the keys to the field warehouse and that no one else has or holds keys to the premises and that also in Nickell's possession are keys to the building through which the entrance to the field warehouse is obtained.

At the trial it was not developed how a shortage occurred in the field warehouse as the plaintiff takes the position that under the bonded representative's agreement the defendant is liable for any loss without regard to how the loss may have arisen. It asserts that the defendant, having possession and custody of the warehouse and goods included therein, is thus absolutely liable for the shortage whether through negligence or intentional misconduct. The defendant, as heretofore stated, asserts that all releases and movement of goods from the field warehouse were at the direction of his other employer, Ozark, but with the knowledge and consent of the plaintiff.

In Heekin Can Company v. Kimbrough, (W.D.Ark.1961) 196 F.Supp. 912, the Lawrence Warehouse Company sought to recover for a shortage in a field warehouse of the Heekin Can Company at Ozark which was supervised by a bonded representative who was also employed by the corporation on whose premises the field warehouse was maintained. In that action no recovery was sought against the bonded representative, but the President of the corporation on whose premises the field warehouse was maintained was sought to be charged with the alleged loss. It was not developed in the Heekin case how the shortage occurred. The court held, however, that the conduct of the bonded warehouseman

was the proximate cause of the shortage and that the warehouse was not negligent in the employment of a servant and employee of the corporation where the field warehouse was established. The court at page 924 stated:

"These and other cases recognize that all of the companies engaged in the field warehousing business normally employ as custodian or warehouse manager a competent person in the employ of the depositor familiar with the type of commodity warehoused, so that proper control and supervision may be maintained. Invariably, the wages to be paid such individual by the warehouse company are transmitted to the field warehouse company by the depositor, and are then sent to the employee by the warehouse company. Thus, the depositor assumes no additional expense in the operation of its business. Such was the case here with the manager, Faught. See Philadelphia Warehouse Co. v. Winchester et al., C.C.Del.1907, 156 F. 600."

Under a field warehouse arrangement as stated in the Heekin case, supra, the bonded representative is usually selected from the employees of the business on whose premises the field warehouse is established. In the instant case the plant manager of Ozark was selected to act in the capacity of the warehouseman, and a compensation arrangement was negotiated by the parties which placed the duty of paying the representative upon the plaintiff, with the duty of reimbursement by Ozark. The arrangement was that the bonded representative would issue a check on Ozark and remit it to plaintiff in an amount which covered his salary, withholding, Social Security, and the cost of a representative's bond and the fee for maintaining the field warehouse. After receipt by plaintiff of Ozark's check, it executed its own check for the net salary which was remitted to the bonded representative. Defendant Nickell, the bonded representative, was in fact an employee of both the warehouse

and the canning company at all times, and his compensation, although directly paid by the plaintiff, ultimately was borne by Ozark. It is impossible to separate Nickell's duties at any given time with respect to his activities upon behalf of either Ozark or plaintiff. It is almost a fiction to assert that he was an employee of plaintiff when he was at the same time the General Manager of Ozark and supervising its operations.

Although a certain portion of Ozark's remittance to the warehouse corporation each month covered the cost of a warehouseman's bond, no individual bond was ever procured on defendant Nickell. The evidence does establish, however, that plaintiff obtained and carried a general bonded representative's coverage policy with Lloyd's of London with an exemption or deductible clause of $25,000 as to each warehouse shortage. It is established in the instant case that the shortage of the field warehouse at the Ozark Canning Company is within the deductible provision of the Lloyd's of London policy coverage and no claim was made upon plaintiff's insurance carrier to pay the shortage.

The evidence further establishes that the conference between representatives of plaintiff and George Jones at Jones' office at Spiro, Oklahoma, resulted in the promise by Jones to execute promissory notes on behalf of the corporations but not himself individually to cover the shortage in the field warehouses at Ozark and at Spiro. It it not established, however, that the execution of the promissory notes was intended to release defendant's individual liability for the shortage at Ozark. The second set of promissory notes differs from the first primarily in the mathematical calculation of the amount of the loss.

The defendant in its brief in support of its contention that the promissory notes were intended as a novation for the personal liability of the defendant cites the following cases: Logan v. Williamson, (1841) 3 Ark. 216; Home Life Insurance Co. v. Arnold, (1938) 196 Ark. 1046, 120 S.W.2d 1012; Myers v. Shinn,

(1940) 201 Ark. 857, 147 S.W.2d 359; Shinn v. Kitchens, (1945) 208 Ark. 321, 186 S.W.2d 168; Simmons National Bank of Pine Bluff v. Dalton, (1960) 232 Ark. 359, 337 S.W.2d 667; Skelton Motor Co. v. Brown, (1962) 234 Ark. 500, 353 S.W.2d 1.

In Shinn v. Kitchens, supra, and Myers v. Shinn, supra, it was held that accord and satisfaction, although pleaded, were not proved, and the court recited the principle that an obligor has the duty of showing that a purported accord and satisfaction was agreed to and intended by all parties affected by it. In Simmons National Bank of Pine Bluff v. Dalton, supra, a novation was pleaded as a defense by an obligor and the court stated that there must be a clear and definite intention on the part of all concerned that the novation was intended. Under the principles set forth in these cases, as well as Skelton Motor Company, supra, and Home Life Insurance Company, supra, the court is of the opinion that the evidence adduced at the trial has failed to establish an agreement and intention on the part of all the parties that a novation was contemplated. The defendant's own witnesses, as well as the witnesses for the plaintiff, uniformly testified that at the time the first set of promissory notes were delivered to George W. Jones at Spiro in the presence of the plaintiff's representatives and Bennie Cox, Jones' treasurer and secretary, no statements were made regarding the personal liability of any party, including Mr. Jones, Bennie Cox and Archie T. Nickell. The only statement made by representatives of plaintiff with respect to the notes was that they were to be executed by Jones on behalf of Ozark and Fresh Canning Companies to cover the shortage. Jones at that time declined to execute any notes personally, although it was contended by plaintiff that he had personally guaranteed any possible loss arising from the warehouses at the Fresh and Ozark Canning Companies.

▇▇▇ The essential requisites of a novation embrace consent by all affected parties that the proposed agreement be substituted as a complete release or in lieu of a prior obligation. It has not been shown by the defendant in the instant transaction that a novation was intended or contemplated and expressly consented to by the parties to release the personal liability of anyone, including the bonded warehouse representative. There is some evidence that the field representatives of plaintiff stated to Jones that if he would execute the promissory notes on behalf of the corporation, it would "settle the whole deal." A novation cannot be established between parties without their consent. There can be no consent to an arrangement when a party does not participate in it nor has any knowledge of it. Suffice it to say that the personal liability of defendant could not have been affected by the conversation and meeting between the plaintiff's representatives and Jones at Spiro because Nickell was not a party and did not participate at the meeting. The Simmons National Bank of Pine Bluff v. Dalton case, supra, contains the following statement by the Supreme Court of Arkansas, which seems particularly applicable to the instant claim of novation at page 369 of 232 Ark., at page 673 of 337 S.W.2d:

"Our decisions and the text-writers appear to be uniform in holding that it is necessary to show an *intent* on the part of the creditor to release an old debtor and substitute therefor a new debtor. In Home Life Insurance Company v. Arnold, 196 Ark. 1046, 1047, 120 S.W.2d 1012, 1016, * * * '* * * the effect of the novation is the *intention* of the parties.' (Emphasis supplied.) Likewise, at Pages 266 and 267 of Volume 39 Am.Jur., it is stated, among other things, that: 'In order to effect a novation there must be a *clear and definite intention* on the part of *all* concerned that such is the purpose of the agreement.' (Emphasis supplied.) In Williston on Contracts, Volume 6, Revised Edition, at Page 5254, Sec-

tion [1860] 1870, under the sub-title *'Necessity for the assent of all parties to a simple novation'* it is stated: 'It is undoubtedly a *commonplace* in the discussion of novations that the *assent* of all parties is necessary; and certainly \* \* \* no old debtor can be discharged without the creditor's consent, \* \* \*' (Emphasis supplied.) Numerous cases therein are cited sustaining the above announcement."

When the second set of notes was delivered to the City National Bank, the bank declined to release them to plaintiff until its advancements on the warehouse receipts had been satisfied by plaintiff. Under the agreement between Ozark and Fresh Canning Companies and plaintiff, as additional security, the President of the canneries, Jones, had executed a personal guaranty covering any shortage in field warehouses at either cannery without regard to the cause of the shortage. As heretofore stated, all of the witnesses who were present at Spiro when the first set of notes were executed by Jones on behalf of the two canneries, including Jones and the Spiro bonded representative, Bennie Cox, testified that nothing was said with respect to the individual or personal liability of *any* party at that time. At the Spiro meeting warehouse receipts were also given on the free goods contained in the Ozark warehouse as additional security to cover the Ozark shortage.

The defendant in his reply brief asserts that Ozark was not liable under the terms of the warehouse agreement to plaintiff as the storer and is not responsible for any loss. He asserts that the plaintiff would be liable in fact to the storer for any shortage. The rights and duties under the contract are accurately stated by defendant, but the storer in this case itself sold the goods and received them for delivery to the purchaser and received proceeds of the sale. The storer thus became a debtor of the plaintiff for those goods covered by a warehouse receipt which it received and for

which it did not remit to the bank the sum advanced to it on those goods. When Ozark executed the notes after the shortage was discovered, it was thus only promising in writing to pay a debt which already existed—the security value of the goods it had thus converted. There was certainly nothing improper in plaintiff's requesting Ozark to execute the notes as evidence of this indebtedness and as security for its payment.

The defendant's argument that Ozark was not obligated to plaintiff upon the agreement thus fails to embrace the fact that the storer received the goods not only in violation of the warehouse agreement, but by such action impliedly promised to protect the plaintiff from liability on the warehouse receipts that covered the goods so received.

As to defendant's contention that the defendant did not have to participate in the alleged novation to be the beneficiary of an agreement to take the promissory notes in settlement of the shortage, he cites Home Life Insurance v. Arnold, supra, and Simmons National Bank of Pine Bluff v. Dalton, supra. The Supreme Court in the Simmons case, in discussing this particular principle, stated at page 363 of 232 Ark., at page 670 of 337 S.W.2d:

"*Novation.* After careful consideration we have concluded that the trial court erred in holding that there was a novation, thereby relieving Dalton (and his wife) from the obligation to pay the note held by appellant. The learned Chancellor held, and it seems to be conceded by everyone, that there was no such novation at the time Dalton purchased the new 1958 Ford. It is undisputed that Thompson did agree to assume the debt to appellant but it is not conceded by anyone that appellant knew of this agreement much less that it consented to release Dalton when the trade was made. Therefore, it must be assumed that if any novation occurred it took place later during the year 1958. The record fails to show, and Dalton

does not even contend, that appellant at any time expressly agreed with Dalton that it would release him from the debt and look solely to Thompson for payment.

"The learned Chancellor, however, took the view, and correctly so, that it was not necessary for appellant to expressly agree with Dalton that he would be relieved of liability and that he would look solely to Thompson, but that such agreement and intent on the part of appellant could be inferred from appellant's actions. We do not agree, however, that such an inference is tenable under the facts of this case."

It is not established by the evidence in the instant case that the creditor-plaintiff and the other parties present at the Spiro meeting agreed to release Nickell.

The defendant Nickell breached his bonded representative agreement with the plaintiff when he removed goods at the instance of his employer, Ozark, over a period of several months. Nickell personally did not receive the goods nor the proceeds therefrom although his employer, Ozark, did. The conduct of Nickell in releasing the goods at the instance of Ozark is not chargeable to the plaintiff. Although shortages had occurred in the past, affirmative action was taken by plaintiff each time demanding that the account be discharged by satisfying the advancements made by the bank. The major shortage prior to the termination of the field warehouse was the November 1959 shortage. The certified audit report of November 25, 1959, by Mr. E. G. Logan contains a letter of transmittal to Douglas-Guardian which reflects the following:

"A complete count was then made of the warehouse and merchandise in the amount of $43,526.32 was found out on releasing privilege of only $15,000.00. I had the B/R to make release 28, dated November 27 which I delivered to the bank myself. This release was in the amount of $43,-598.85 to cover entire amount. I

had a meeting with the B/R and the storer over this and they had no explanation as to why this large amount had not been released before. Personally I am sure it was an oversight but I told both the storer and the B/R that this cannot be tolerated and we do not expect it to happen again. The B/R's records are kept by the bookkeeper and she is a new employee so we brought her into the discussion. I feel that this will not happen again in such a large amount."

Therefore, the court is of the opinion that plaintiff is not estopped to assert any claim against the defendant Nickell, as the defendant's activities in releasing the goods to Ozark were in violation of his agreement with the plaintiff, and that there was no novation on the part of Ozark and Douglas-Guardian which relieved the individual bonded warehouse representative of personal liability by the execution of promissory notes by Ozark and Fresh Canning Companies.

In accordance with the above an order is being entered today granting judgment for the plaintiff in the sum of $19,511.09 and costs.