## BRAGG *v.* HARTNEY.

Opinion delivered October 18, 1909.

TRUSTS EX MALEFICIO—WHEN ENFORCED—Wherever the legal title to prop-
erty, real or personal, has been obtained through fraud or duress, or
under circumstances which render it inequitable for the holder
of the legal title to retain and enjoy the beneficial interest, equity
impresses a constructive trust in favor of the one equitably entitled
to the same as against the original wrongdoer or any subsequent
holder until a purchaser in good faith acquires title.

Appeal from Clay Chancery Court; *Edward D. Robertson,*
Chancellor; affirmed.

*R. H. Dudley,* for appellant.

1. The test of mental incapacity is not merely that the
grantor's mental powers are impaired, but whether he has suffi-
cient capacity to understand in a reasonable manner the nature
and effect of the act which he is doing. 13 Cyc. 573; Words &
Phrases, 5, 4475.

2. Bragg did not overreach Hartney or practice any fraud
to induce him to make the contract against his will.

3. The heirs of Hartney have no greater rights than he
would have if alive.

*M. P. Huddleston* and *Johnson & Burr,* for appellees.

1. The overwhelming weight of the testimony shows that
Hartney was incapacitated to make binding contracts, and that he
was overreached and defrauded by Bragg. The chancellor so
found, and this court will not reverse. 67 Ark. 200; 73 *Id.* 489.

2. The sale and confirmation were void. There was no
judge and no court. 1 A. & E. Enc. Pl. & Pr. p. 240; 2 Ark. 229;
24 *Id.* 479; 27 *Id.* 349; 115 N. Y. 185; 21 N. E. 1039; 39 Am. St.
327; 39 Ill. 554; 20 Ark. 76; 38 Ark. 78.

3. Hartney paid the whole purchase price for the land, and
Bragg held the legal title in trust for Hartney. 15 Am. & Eng.
Enc. of Law (2 ed.), 1132-1135.

HART, J. This is a suit in equity instituted in the Clay Chan-
cery Court for the Eastern District by appellees, Martin Hartney
and Mary Meschal, against the appellant, J. L. Bragg.

The abstract of appellees correctly states the substance of
the pleadings and the findings and decree of the court, as follows:

"Appellees, as sole heirs at law of T. J. Hartney, deceased, filed their amended complaint against J. L. Bragg, the appellant, and F. Linke, alleging therein that Bragg and T. J. Hartney in his lifetime bought a farm of 240 acres of R. Liddell for the agreed price of $5,000; $3,000 was paid in cash by Hartney at the time of the foreclosure, and $2,000 was secured by two notes of Hartney and Bragg, who afterward made a mutual partition of the land by exchange of deeds. Hartney died before any part of either notes had been paid. Bragg procured an administrator of Hartney's estate to be appointed by the probate court of the Eastern District of Clay County, Arkansas, procured both land notes to be allowed and proved as debts against the Hartney estate, and caused Hartney's land to be sold by the administrator to pay said notes, at which sale Bragg was the purchaser at the price of $1,000. F. Linke, the assignee of said $2,000 of land notes, took a mortgage on the entire 240 acres for $2,000 from Bragg on the day of the administrator's sale. Said $2,000 and interest constitute a lien on all said lands in favor of said Linke, and is unpaid.

Appellees further allege that T. J. Hartney was, at the time of the purchase of the land from Liddell, the payment of the purchase price thereof, the division of the land and the execution of the deed to Bragg in consummation thereof, a weak-minded person, wholly incapable of making or entering into contracts, or executing deeds, or dividing lands, or transacting any other business. Hartney paid all the $3,000 cash payment for the land, and Bragg paid no part thereof. Bragg, through overreaching, undue influence and fraud practiced upon Hartney, procured the deed for the land to be made to himself and Hartney, procured an unjust division of the land to be made and Hartney's deed pursuant thereto. Through fraud Bragg procured the allowance of the whole of the $2,000 of purchase money notes to be proved as debts against Hartney's estate and the lands standing in Hartney's name to be sold by the administrator to himself for $1,000, by means whereof Bragg acquired title to the whole 240 acres without having paid a cent of the purchase price thereof.

Appellees further averred that because of Bragg's fraud all deeds by which Bragg got any title to said lands are null and void, that the pretended sale by the administrator is likewise null

and void, and that all said deeds ought to be canceled and held for naught. Appellees offer to pay to Linke the amount of the $2,000 of unpaid purchase money, with interest, and prayed the court to cancel all deeds by which Bragg took any title to said lands and to divest all title thereto out of Bragg and invest the title in appellees, subject to Linke's claim and for all proper relief.

Bragg filed his separate answer in the suit, wherein he admits the purchase of the lands from Liddell, taking the deed for the same to himself and Hartney, the division of said lands, the death of Hartney and the purchase of that interest by himself at the administrator's sale; but he avers that he paid to Hartney the half of the cash payment, denies all averments of fraud, and claimed to be the owner of all said lands. Upon the trial of the cause the chancellor found all the issues in favor of appellees and against Bragg, and by the final decree canceled all deeds by which Bragg claimed title to said lands, and divested all his interest therein, and vested the same in appellees, and charged a lien on said lands in favor of Linke for $2,945.44, the amount of unpaid purchase money and interest. Bragg alone appeals from this decree.

Prior to coming to the State of Arkansas, appellant J. L. Bragg and T. J. Hartney had lived in Hickman County, Kentucky. Bragg was the older, and had known T. J. Hartney from his birth. A preponderance of the testimony shows that from childhood Hartney had been mentally weak and almost an imbecile. His father died leaving a will, by the terms of which the lands devised to T. J. Hartney could not be sold until he reached the age of 30 years. As soon as he came into possession of his lands and personal property, Hartney began to dispose of it for a nominal price. Appellant Bragg and one Houston got some of it. Proceedings were instituted by his friends in Kentucky to have him declared of unsound mind, and a committee appointed to take care of his estate. The order was made, but no one could be found who would act. Soon afterwards, in January, 1903, Bragg came to Arkansas. T. J. Hartney sold his lands in Kentucky for $3,995. He received a draft for $3,000 and the remainder in cash.

The land in controversy was sold to Bragg and Hartney for

$5,000. Three thousand dollars of the purchase money was paid with the above-mentioned draft of T. J. Hartney, and the notes of Bragg and Hartney were given for the deferred payments. The title was taken in the name of Bragg and Hartney.

Hartney came to Arkansas in February, 1903, and moved on the land with Bragg. He was never permitted to exercise any authority over the land, and implicitly obeyed Bragg in all things. Hartney had lived with Bragg before coming to Arkansas. Just a short while before they left Kentucky, Bragg, referring to Hartney, said: "I have got a sucker, and when I turn him loose he won't do any one else any good." He further said: "I have got Tom Hartney on the string now; it is 'old man Bragg' now, and it will be 'Mr. Bragg' next year."

Bragg and Hartney made a division of the land, and Bragg received the more valuable part. Hartney then went back to Kentucky, and died in March, 1904. He was buried at the expense of the county. The notes for $2,000, the balance of the purchase money, were probated against Hartney's estate, and that part of the land, the title to which was in his name, was sold to pay them. Bragg became the purchaser. He told one of his neighbor's that Hartney's father had died in good circumstances, leaving Tom as his only child, and that he, Bragg, had just as well have the estate as any one. Bragg claims to have paid one-half of the $3,000 which was paid when the deed was executed, but a preponderance of the testimony shows that he was insolvent, and that the $3,000 was paid by T. J. Hartney. We are of the opinion, after a thoughtful reading of the record, that Bragg knew that Hartney was weak-minded and utterly incapable mentally of transacting any business; that Hartney was wholly under the control and dominion of Bragg; and that on account of the undue influence exercised by Bragg he was induced to pay the $3,000 in the beginning and let the title be taken in the name of Bragg and himself; that the whole transaction was fraudulent from its inception, and was deliberately planned by Bragg to get possession of the estate left Hartney by his father, without any cost to himself. Appellees are the sole heirs at law of the deceased T. J. Hartney, and as such have succeeded to his rights in the property. The rights of F. Linke were protected by the decree of the chancellor, and he has not appealed.

The general rule on the subject is thus stated in vol. 3 of Pomeroy's Equity Jurisprudence, at page 2033, as follows: "In general, whenever the legal title to property, real or personal, has been obtained through actual fraud, misrepresentations, concealments, or through undue influence, duress, taking advantage of one's weakness or necessities, or through any other similar means or under any other similar circumstances which render it unconscientious for the holder of the legal title to retain and enjoy the beneficial interest, equity impresses a constructive trust on the property thus acquired in favor of the one who is truly and equitably entitled to the same, although he may never perhaps have had any legal estate therein; and a court of equity has jurisdiction to reach the property, either in the hands of the original wrongdoer or in the hands of any subsequent holder, until a purchaser of it in good faith and without notice acquires a higher right, and takes property relieved from the trust. The forms and varieties of these trusts, which are termed *ex maleficio* or *ex delicto,* are practically without limit. The principle is applied wherever it is necessary for the obtaining of complete justice, although the law may also give the remedy of damages against the wrong-doer."

Without going into further details of the testimony of this case, it is sufficient to say that it brings the cause squarely within the principles above announced.

We are of the opinion that the decree of the chancellor is correct, and it, therefore, will stand affirmed .