Darian HORTON *v.* Margaret Ann KONER,
Mary Angelon PARKER, Pamela Jean MORRIS,
Esther GREENWALD, Patti CARDOZA,
Christine Marie SEEBA, and Diana RIVERS

CA 83-303                           671 S.W.2d 235

Court of Appeals of Arkansas
Division I
Opinion delivered June 13, 1984

*Thomas A. Martin, Jr.,* for appellant.

*Ginger Parker Crisp,* for appellees.

Tom Glaze, Judge. This appeal results from the chancellor's denial of partition in an action the appellant brought against the seven appellees. The facts are undisputed. In 1972, the appellee Diana Rivers purchased a 520-acre tract in Newton County on which she established a community called Sassafras. The residents of Sassafras had a "back to the land" philosophy. In an attempt to return to a simpler life, the group eschewed chemical fertilizers and pesticides in their gardening, conducted their business by a "consensus democracy," and held an antipathy toward private ownership of property. In 1978, by a consensus of women residents, Sassafras became a community of women only. When the men were requested to leave, appellee Rivers deeded forty acres to a married couple who had been residents and active participants in the community since its inception.

At about the same time the men left, on June 6, 1978, Rivers, who had sole title to the property, made a deed to the remaining 480 acres, naming herself and the six other appellees as joint tenants with rights of survivorship. Appellant was away from Sassafras at the time the deed was made. When she returned, she complained to the appellees that she had not been named on the deed, despite the fact that she had been a resident for two years, had participated actively in the community, and had halfway completed a dwelling on the property. As a consequence, in September, 1978, Rivers made a new deed naming appellant and the seven appellees as joint tenants with rights of survivorship.

In 1979, the residents of Sassafras became embroiled in a dispute over permitting a group of women they called gypsies to come into the community to live. The appellant left the community and the state as a result of the controversy. In March of 1980, apparently when appellant was gone, the appellees — described as Anglo-Saxon — deeded a 120-acre tract to two minority women, leaving the 360 acres that are the subject matter of this dispute.[1] In 1981, she commenced the partition action that is the subject of this

---

[1] Appellant testified that she was on the land when the decision to deed the land to the minority women was made and when the deed was drawn, but not when the deed was filed. However, the deed does not reflect appellant's name as one of the grantors.

appeal. She contended below that she was entitled to a one-eighth interest in the 360-acre tract by virtue of the warranty deed naming her as an owner. She also contended the land is not divisible in kind and asked the chancery court to order the lands sold and the proceeds divided. The chancellor heard testimony from the appellant, appellee Rivers, two other appellees, and five women who were residents of Sassafras at the time of the action below.

The intentions of the parties, the living arrangements, and the agreements they had with each other with respect to the land were undisputed. Although appellee Rivers provided all of the $40,000 purchase money for the land, she testified that she did not consider it her private property, but rather community property, purchased because, "I had money and there [were] a lot of people interested in living on land in the country, growing gardens and doing all that stuff." The arrangement, according to all the testimony, was that Rivers and the others intended to create a "land trust," but when they were unable to do that legally, they created the joint tenancy as an interim means of sharing power and responsibility. Their goals were to create a community for women of like ideals and to treat the land with respect. They disclaimed any notion of private ownership but contended the women named on the deed were "caretakers" of the land and representatives of the community of women who lived and worked on the land. Even the appellant, in her effort to have the land partitioned, testified that she had never considered herelf an owner of the land. Her contention was that in permitting the gypsies to come onto the land, to "trash" the land, and to ignore the principles on which Sassafras was founded, the others had abdicated their responsibility to protect the land. She now feels she is entitled to something for the time and the efforts she expended for the five years she lived in the community.

The testimony indicated that actual residence at Sassafras was not a prerequisite to one's being named on the deed. In fact, neither the appellant nor any of the appellees lived on the land at the time of the hearing. Diana Rivers testified that she maintained a cabin there but that her primary residence was in Fayetteville.

The chancellor made lengthy findings of fact. He determined that in making the joint tenancy deed, the parties intended to protect the land and to prevent its sale. He impressed a constructive trust upon the property and found that appellant held the property in trust for the grantor, the other grantees, and the community of women who lived on the land. He ordered the appellant to convey her record interest to the appellees as joint tenants. He ordered that appellant be permitted to remove personal property from the land and to remove or to sell the dwelling she had constructed. The appellant contends on appeal that the chancellor erred in two respects: (1) in imposing a constructive trust and enforcing a parol agreement not to partition, and (2) in failing to grant appellant reimbursement for her improvements to the property.

The chancellor imposed a constructive trust after he found that the appellant was in a confidential relationship with the appellee Rivers, the other appellees, and the other members of the community. The chancellor found:

> It is clear that [appellant] had gained the confidence of all these individuals and in accepting placement on such deeds purported that she would act in their best interest to preserve the community and its goals. . . . Despite the occasional problems within the community, all member[s] were committed to the goal of preserving the land and deeply trusted each other in that regard. Besides the family nature of their living arrangement fostered by the small size of the group, the members of the community were kindred spirits with a special trust between themselves regarding the basic goals of the community, especially preservation and nonconveyance of the land. . . . To allow [appellant] 1/8 of the sale proceeds of the property would constitute unjust enrichment.

On appeal, we affirm the chancellor's findings of fact unless they are clearly erroneous or clearly against the preponderance of the evidence. Ark. R. Civ. P. 52(a). Also, we affirm if the chancellor reached the right result, even if he gave the wrong reason for his decision. *Moose* v. *Gregory,*

267 Ark. 86, 590 S.W.2d 662 (1979); *Williams* v. *Cotten,* 9 Ark. App. 304, 658 S.W.2d 421 (1983).

In the case at bar, the chancellor heard extensive testimony regarding what the parties intended when appellee Rivers made a deed naming herself, the appellant and the other appellees as owners. None of the evidence reflects the parties intended by their deed to create an express trust regarding the land in question. Rather, the chancellor utilized an equitable tool — the constructive trust — in order to prevent unjust enrichment to appellant who admittedly never considered herself an owner of the property, not even at the time of the hearing wherein she was seeking partition. All of the parties who testified with knowledge of the creation of the deed, including the appellant, testified that none of them owned the land, but that all were volunteers who assumed the responsibility of having their names on the deed and of being "caretakers" of the land.

Constructive trusts are said to arise and be imposed in favor of persons entitled to a beneficial interest against one who secures legal title either by an intentional false oral promise to hold title for a specified purpose, and having thus obtained title, claims the property as his or her own, or one who violates a confidential or fiduciary duty or is guilty of any other unconscionable conduct which amounts to constructive fraud. *Andres* v. *Andres,* 1 Ark. App. 75, 613 S.W.2d 404 (1981); *see also Henry* v. *Goodwin,* 266 Ark. 95, 583 S.W.2d 29 (1979). A constructive trust is an implied trust that arises whenever it appears from the accompanying facts and circumstances that the beneficial interest should not go with the legal title. *Andres* v. *Andres, supra.* Proof of fraud is not essential to the establishment of a constructive trust. *Davidson* v. *Sanders,* 235 Ark. 161, 357 S.W.2d 510 (1962). The chancellor below did not find that the appellant had committed fraud, but that the parties were in a confidential relationship.

A confidential relation exists between two persons when one has gained the confidence of the other and purports to act or advise with the other's interest in mind. *Henry* v. *Goodman, supra.* There is no set formula by which

the existence of a confidential relationship may be determined, for each case is factually different and involves different individuals. *Donaldson* v. *Johnson,* 235 Ark. 348, 359 S.W.2d 810 (1962). The cases for the application of the doctrine cannot be scheduled. They pervade all social and domestic life. *Id.* Whether or not a confidential relationship exists depends upon the actual relationship between the parties. *Bramlett* v. *Selman,* 268 Ark. 457, 597 S.W.2d 80 (1980). A kinship is not necessary for a confidential relationship. *Id.*

The facts at bar present a classic case for imposition of a constructive trust. The parties agreed orally to hold the property for the grantor, appellee Rivers, to share her responsibility for the care of the land, and for the community of women who would inhabit Sassafras, including, but not limited to, the appellant and the appellees. When one takes property under a deed, absolute on its face, but has orally agreed to hold the property for the benefit of the grantor or a third person, a constructive trust may be imposed to prevent unjust enrichment to the constructive trustee. *See, e.g., Henry* v. *Goodwin, supra; Kingrey* v. *Wilson,* 227 Ark. 690, 301 S.W.2d 23 (1957); *Grissom* v. *Bunch,* 227 Ark. 696, 301 S.W.2d 462 (1957); *Andres* v. *Andres, supra.* The chancellor's extensive findings of fact and conclusions of law indicate that he thoughtfully studied the evidence presented to him and the applicable law. We believe the chancellor's finding that the parties enjoyed a confidential relationship with one another is not clearly erroneous. And we agree with the chancellor's decision to impose a constructive trust in favor of the appellees in an attempt to prevent unjust enrichment to appellant. However, we are unable to uphold that part of the chancellor's decree that imposes a constructive trust in favor of "the community."

Diana Rivers testified that Sassafras was being held for the women who lived there and for those who would live there in the future. All of the other women who testified spoke in terms of a "community" that could not be defined by naming names. By imposing a constructive trust to benefit "the community," the chancellor stretched the

concept of constructive trust beyond its limits. Instead of employing a constructive trust to prevent unjust enrichment to the appellant, the chancellor effectuated the parties' intent to hold the land in trust for "the community." In short, the chancellor made for the parties the express trust they failed to make themselves. The court erred in doing so in this action because an express trust cannot be established by oral evidence. *Jones* v. *Gachot,* 217 Ark. 462, 230 S.W.2d 937 (1950); *Patton* v. *Randolph,* 197 Ark. 653, 124 S.W.2d 823 (1939). Thus, the court correctly imposed the constructive trust for the benefit of the appellees, the grantor and grantees named in the deed, but erred in extending it in favor of "the community."

Appellant's second point for reversal is that the chancellor erred in failing to grant her reimbursement for her improvements to the property that she claims enhanced the value of the property by $5,000. On this point, the chancellor ordered she was entitled to remove a dwelling she built on the land or to sell it to someone acceptable to the appellees.[2] Appellant relies upon *Dodds* v. *Dodds,* 246 Ark. 313, 438 S.W.2d 54 (1969), for the proposition that upon partition, a cotenant is to be reimbursed for improvements based upon enhancement in value to the property. The simple answer, of course, is that partition was denied, the appellant was found not to be a cotenant, so the *Dodds* case, which involved tenants in common, does not apply. Appellant also relies upon *Walker* v. *Eller,* 178 Ark. 183, 10 S.W.2d 14 (1928). *Walker,* however, deals with appellants who made valuable improvements to a farm "under the honest belief that they had acquired title thereto. . . ." By appellant's own testimony, she was not operating under color of title. At no time prior to or during construction of her dwelling did she believe that she had acquired title to the property, but only the right to its use. Therefore, the *Walker* case is inapposite.

We affirm that part of the decree impressing a constructive trust for the benefit of the grantor, appellee Rivers, and the grantees, the other six named appellees. We modify the decree to delete any reference that the property is

---

[2]Appellees do not challenge this on appeal.

constructively held for the community.

Affirmed as modified.

MAYFIELD, C.J., and CORBIN, J., agree.