## In re AUTO–TRAIN CORPORATION.

### Civ. A. No. 84–2353.

United States District Court,
District of Columbia.

July 12, 1985.

---

Barry J. Dichter, Cadwalader, Wickersham & Taft, Washington, D.C., for plaintiff-appellee Murray Drabkin, Trustee of

Auto-Train Corp., also known as Railway Services Corp.; Gregory S. Mertz, Abel J. Mattos, Christopher F. Graham, Washington, D.C., of counsel.

Barbara Kacir, Marilyn Shea-Stonum, Wendy R. Relation, Jones, Day, Reavis & Pogue, Cleveland, Ohio and Washington, D.C., for defendant-appellant Midland-Ross Corp.

## MEMORANDUM

### HAROLD H. GREENE, District Judge.

This is an appeal from an order by the United States Bankruptcy Court for the District of Columbia granting summary judgment in favor of Murray Drabkin, Trustee of Auto-Train Corporation, and ordering Midland-Ross Corporation to pay the Trustee $421,354.19, the amount of the alleged preferential transfers it received from Railway Services Corporation, a wholly owned subsidiary of Auto Train, plus interest.[1] The transaction that gave rise to the transfer of funds was a sale of 100 Barber-designed car sets produced by Midland-Ross and sold through its National Castings Division to Marine Industries,

Ltd., a Canadian company. The sale was initiated, structured, and negotiated by Ronald Wilson, a marketing agent for Ronsco Supply Company, Inc. (Ronsco). In April of 1980, Wilson informed Midland-Ross's manager of International Operations (National Casting Division) that Marine wanted to buy 100 car sets from the National Casting Division. Because Ronsco believed certain patent licensing restrictions might be violated if a United States manufacturer of Barber-designed car sets sold such cars directly to a Canadian customer,[2] Wilson contacted Railway and requested that it act as a conduit or intermediary in the transaction.[3] Railway agreed to lend its name to the transaction for a commission of $5,000.[4] Thus, pursuant to the parties' agreement, Midland-Ross was to ship the goods directly to Marine (although Railway rather than Marine would submit the purchase order), and Marine was to wire funds in payment for the goods to Railway which, in turn, would transfer the funds to Midland-Ross.

Initially, Midland-Ross demanded to be paid in advance,[5] however, it later agreed

---

1. The trustee relied on section 547(b) of the Bankruptcy Code, 11 U.S.C. § 547(b), which provides in relevant part that

   the trustee may avoid any transfer of an interest of the debtor in property ...
   (4) made—
   (A) in or within 90 days before the date of the filing of the petition.

2. Midland-Ross manufactured and sold the car sets under a patent license agreement. Midland-Ross claims that this agreement granted it a non-exclusive but unlimited right to manufacture and sell the products under any patents in the portfolio of the licensor at any time and that the agreement contained no territorial restrictions. The Trustee, on the other hand, alleges that Midland-Ross was precluded from making direct sales to Canadian customers under the licensing agreement.

3. Ronsco suggested that Midland-Ross use Railway as the conduit because Ronsco had previously set up a contract between Railway and Marine.

4. Railway has never denied its role in the transaction as one of a conduit. It explained the reason for its involvement to the Bankruptcy Court as follows: "Railway was serving as a

conduit because Midland-Ross could not sell directly to Marine." Affidavit of Lawrence Reuter, Vice President of Equipment for Auto-Train, attached to Trustee's cross-motion for summary judgment of November 25, 1983.

5. Because under the original plan, Marine was to pay Railway before it received the car sets, Railway, in order to protect Marine, made arrangements with its bank in Washington, D.C. to set up a separate account for receiving payments from Marine. On May 5, 1980, Railway wrote a letter to its bank, advising it that Marine would telex funds into Railway's account, and instructing the bank that upon confirmation from National Castings (Midland-Ross) and Railway, it should wire the necessary funds to Midland-Ross's bank in Chicago. Railway also advised its bank that

   Mr. Ron Wilson of Ronsco Supply Company, Ltd. has been designated by Marine Industrie Limitee as their representative with RSC in this transaction and he has requested confirmation from our bank that the receipt and disbursement of funds on this transaction be handled in such a way as to guarantee RSC and Marine Industrie that the portion of the funds required to fully pay the cost of the goods F.O.B. at National Castings plant are

to accept payment immediately upon delivery of the car sets. On May 27, May 30, and June 5, 1980, Midland-Ross shipped car sets in separate batches to Marine. These shipments, although addressed to Railway, were sent directly to Marine's location in Canada from Midland-Ross's plant in Sharon, Pennsylvania. The bills for the shipments which were also made out and sent to Railway, came to a total of $421,393.74 —$105,846.15 by invoices dated May 23, 1980 (shipped on May 27); $211,731.57 by invoices dated May 30, 1980 (shipped on May 30); $103,897.52 by invoices dated June 5, 1980 (shipped on June 5); and an $81.50 credit on June 2, 1980.

Upon the arrival of the car sets, Marine made payments to Railway in four separate installments totalling $499,671.10 to cover Midland-Ross's contract price, Railway's commission, Rosco's commission, and the shipping charges.[6] These payments were deposited in a special account designated "Side Frames and Bolsters" set up by Railway.[7] Railway then transferred funds from this account to Midland-Ross as follows: $105,846.15 on June 11, 1980, $170,000.00 on June 25, 1980; $41,692.30 on June 26, 1980; $75,000.00 on July 9, 1980, and $28,815.74 on July 15, 1980. The remaining funds were used to pay Railway, Rosco, and the freight charges. All fund

transferred from Railway to Midland-Ross were made from this specially designated account which, with two exceptions, was used exclusively to pass funds from Marine to Midland-Ross.[8] Railway never earned any interest on these funds and, after the conclusion of the sale transaction, it closed the special account.

## I

On September 8, 1980, Auto-Train filed a voluntary petition for bankruptcy under Chapter 11 of the Bankruptcy Code. Shortly thereafter, Murray Drabkin was appointed Trustee. On November 10, 1980, the Trustee filed an application for leave to consolidate the assets and liabilities of Railway into the Auto-Train proceeding, and to have them administered as part of the proceeding. The Trustee also moved to amend the caption of the petition to reflect that Auto-Train is "also known as Railway Services Corporation." Copies of the Trustee's application and notice of the hearing to be held on such application were personally served on some of Auto-Train's creditors and a general notice was published in four local newspapers,[9] including newspapers in cities where Railway was headquartered and had its operating facilities.[10] This notice did not state that the Trustee's

---

expressly used for this purpose and that Marine Industrie has a clear title to above mentioned goods.
Letter dated May 5, 1980, from Lawrence G. Reuter, Executive Vice President and General Manager of Railway, to Mr. Frank Hill, Vice President of United National Bank of Washington.

6. Marine made payments to Railway of $133,306.60 on June 5, 1980; $132,181.50 on June 6, 1980; $117,091.50 on June 16, 1980; and $117,091.50 on June 25, 1980.

7. Each car set sold to Marine consisted of two side frames and a bolster. All but the first payment were deposited directly into Railway's "Side Frames and Bolsters account", account no. 10400-402-2. The first payment of $133,306.60 was deposited in Railway account no. 10400-465-5 on June 5, 1980. However, on that same day, Railway opened its "Side Frames and Bolsters account" and it transferred $117,091.50 of the first payment to that account.

8. In June of 1980, Railway transferred $88,000 —$15,000 on June 10, 1980 and $73,000 on June 19, 1980—from this account to its general checking account. On July 15, 1980, Railway transferred $26,008.19 from its own general account to its "Side Frames and Bolsters account."

9. *I.e.*, the *Washington Law Reporter*, the *Washington Star* (both of Washington, D.C.), the *Virginia Pilot* (of Norfolk, Virginia), and the *Orlando Sentinental Star* (of Orlando, Florida).

10. The notice stated that the Bankruptcy Court would consider the motion of the Trustee to amend the petition filed by Auto-Train under Chapter 11 to change the caption to read "Auto-Train Corporation, a Florida corporation, also known as Railway Services Corporation, a Delaware corporation, a wholly owned subsidiary." It further stated that the court would consider the Trustee's requests that the assets and liabilities of Railway be administered as part of and consolidated with the Reorganization proceedings of Auto-Train.

application, if granted, would be given retroactive effect.

Midland-Ross, which is headquartered in Cleveland, Ohio and transacted business with Railway in Sharon, Pennsylvania, received no actual notice of the hearing.[11] At the November 21, 1980 hearing, the only creditor to oppose the consolidation was the law firm of Wolf, Block, Schorr and Solis-Cohen, which had rendered legal services to Auto-Train and Railway both before and after the Auto-Train bankruptcy filing. Immediately following the hearing, the Bankruptcy Court ruled that Railway was an alter ego of Auto-Train and, on that basis, it entered an order consolidating Railway into Auto-Train's bankruptcy proceeding *nunc pro tunc* to September 8, 1980, the date the Auto-Train petition was filed.

Approximately two years later, the Trustee filed a complaint against Midland-Ross to recover $421,354.19, the amount it received from Railway as payment for the 100 car sets it sold to Marine. Because these transfers were made between June 11, 1980 and July 15, 1980—more than 90 days before the motion to consolidate was entered (and, in all but one case, before the motion was even filed), the Trustee relied on the *nunc pro tunc* nature of the consolidation order to calculate the preference period.

On October 19, 1983, Midland-Ross filed a motion for summary judgment with the Bankruptcy Court in which it made essentially the same arguments that it makes here. It argued that (1) the preference period must be measured from November 21, 1980 rather than from September 8, 1980 because (a) the Bankruptcy Court lacked power to consolidate Railway into the Auto-Train bankruptcy proceeding *nunc pro tunc;* (b) Railway's creditors,

including Midland-Ross, were denied procedural due process when they were not given reasonable notice of the Trustee's motion to consolidate, and therefore had no opportunity to appear and to participate in the hearing; (2) the transfers from Railway to Midland-Ross satisfy the requirements of section 547(c)(1), (2), and (4) of the Bankruptcy Code and therefore are not subject to avoidance; (3) Railway did not have an equitable interest in the funds it transferred to Midland-Ross; and (4) the evidence produced by the Trustee and relied upon by the Bankruptcy Court was inadmissible hearsay which should have been stricken from the record. The Bankruptcy Court rejected all of these arguments, and granted summary judgment in favor of the Trustee. Midland-Ross was ordered to pay $529,708.47 (the amount of the alleged voidable preferences plus prejudgment interest) to Auto-Train's estate. This appeal followed.

## II

Having reviewed the parties' motions and the record in this case, the Court concludes that the funds transferred to Midland-Ross were subject to a constructive trust. Accordingly, the order entered by the Bankruptcy Court will be reversed and, judgment will be entered in favor of Midland-Ross.[12]

Under section 541(a)(1), upon the filing of a petition for bankruptcy, an estate is created of "all legal or equitable interests of the debtor in property as of the commencement of the case." Notwithstanding the broad scope of this section, Congress did not intend for the bankrupt estate to succeed to a greater interest in property than that held by the debtor. 11 U.S.C. § 541(d).[13] See 4 *Collier on Bank-*

---

**11.** The Bankruptcy Court found that "Midland-Ross would not have received actual, mailed notice of the hearing if such notice had been mailed to all known creditors of Railway because Midland-Ross was not listed as a creditor." Decision at A-32.

**12.** In light of the Court's conclusion that the funds at issue were not the property of Railway

but were held in trust for Midland-Ross, it is unnecessary to resolve the other issues raised by the parties in this appeal.

**13.** This section provides that
[p]roperty in which the debtor holds only legal title and not an equitable interest ... becomes property of the estate ... only to the

*ruptcy* ¶ 541.01 at 541–6 (15th ed.1985). Thus, if a debtor held property in trust for another, the trustee in bankruptcy holds the property subject to the same trust. *In re Professional Air Traffic Controllers Organization*, 724 F.2d 205, 207 n. 10 (D.C. Cir.1984).[14] See also, *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 205 n. 10, 103 S.Ct. 2309, 2313 n. 10, 76 L.Ed.2d 515 (1983) (While declining to delineate the outer boundaries of the bankruptcy estate, the Supreme Court noted that "Congress plainly excluded property of others held by the debtor in trust at the time of the filing of the petition.").

In light of these principles, if the Court were to find that Railway held the funds subject to a constructive trust, the Trustee would not succeed to the funds at issue since Railway held only bare legal title to them and the Trustee, as Railway's successor, would be under an equitable duty to convey the legal title to Midland-Ross, the holder of the equitable title. In short, the imposition of a trust would prevent the funds—the trust res—from becoming part of the bankruptcy estate. *In re Invest-*

*ment Sales Diversified, Inc.*, 38 B.R. 446 (Bkrtcy.D.Minn.1984).

■ The Bankruptcy Code does not define the term "constructive trust."[15] Rather, state law governs both the existence and applicability of a constructive trust in property held by a debtor in bankruptcy, provided that the property upon which the trust is sought to be imposed is specified and traceable and not a general asset within the bankruptcy estate. *In re Investment Sales Diversified, Inc., supra*, 38 B.R. at 450. See also, *Matter of Esgro, Inc.*, 645 F.2d 794, 797–98 (9th Cir.1981); *Matter of Kennedy & Cohen, Inc.*, 612 F.2d 963 (5th Cir.1980). Here, the Bankruptcy Court correctly found that the law of the District of Columbia governed.[16] However, contrary to that court's conclusion, this Court finds that the application of the District's law to the facts of this case supports the imposition of a constructive trust upon the funds transferred from Railway to Midland-Ross.

■ In the District of Columbia, "[a] constructive trust arises where a person who holds title to property is subject to an

extent of the debtor's legal title to such property but not to the extent of any equitable interest in such property that the debtor does not hold.

**14.** The legislative report explains this principle as follows:

Situations occasionally arise where property ostensibly belonging to the debtor will actually not be property of the debtor, but will be held in trust for another. For example, if the debtor has incurred medical bills that were covered by insurance, and the insurance company had sent the payment of the bills to the debtor before the debtor had paid the bill for which the payment was reimbursement, the payment would actually be held in a constructive trust for the person to whom the bill was owed. This section and proposed 11 U.S.C. § 545 also will not affect various statutory provisions that give a creditor of the debtor a lien that is valid outside as well as inside bankruptcy, or that creates a trust fund for the benefit of a creditor of the debtor. *See* Packers and Stockyards Act section 206, 7 U.S.C. § 196.
H.R.Rep. No. 95–595 at 368, 95th Cong., 1st Sess. (1977); S.Rep. No. 95–989 at 82, 95th Cong., 2d Sess. (1978), U.S.Code Cong. & Admin. News, pp. 5787, 5868, 6324.

**15.** In *Georgia Pacific Corp. v. Sigma Service Corp.*, 712 F.2d 962 (5th Cir.1983), the court explained the concept of a constructive trust as follows:

[T]he person with legal title to the property owes equitable duties to deal with the property for the benefit of another person, Restatement of Trusts, 2d, § 2 ("Definition of a Trust") (1959), because he acquired the title under circumstances where the transferor intended that another have the beneficial interest therein, cf. *Id.*, § 404, ("Resulting Trust"), or because he acquired it wrongfully or would be unjustly enriched if he were permitted to retain it, *Id.*, Comment e ("Constructive trusts").
712 F.2d at 967 n. 4.

**16.** Applying the "dominant contacts" analysis, the Bankruptcy Court determined that the District of Columbia had the greatest contact with the funds because (1) the funds at issue were located in a bank in the District, (2) the debtor had its executive offices in the District, (3) the funds were sent from the District to Midland-Ross's bank, and (4) any failure to pay those funds to Midland-Ross would have left them in the District. Memorandum Order and Decision of June 15, 1984 at 12–13.

equitable duty to convey it to another on the ground that he would be unjustly enriched if permitted to retain it." *Gray v. Gray*, 412 A.2d 1208, 1210 (D.C.1980) (citations omitted). Acquisition of the property by wrongful or fraudulent conduct is not required to establish a constructive trust. Rather, the remedy "can be imposed whenever one unfairly holds title or a property interest and where the holder would be unjustly enriched if permitted to retain such interest." *Id.* See also, Bogert, *Trusts & Trustees* § 471 at 8 (2d ed. 1978). Thus, the imposition of a constructive trust may be appropriate in a wide range of situations, including where the transfer of property was induced by a mistake of fact, embezzlement, conversion of goods, fraud, duress, undue influence, *and a breach of a fiduciary duty. Hertz v. Klavan*, 374 A.2d 871, 873 (D.C.1977).[17]

A fiduciary relationship exists between a principal and its agent so that a constructive trust can be imposed if that relationship is violated. Bogert, *Trusts & Trustees, supra*, at § 481 at 227 n. 84. Here, Railway was acting as the collecting agent for Midland-Ross.[18] Railway opened a special account—the Side Frames and Bolsters account—for the specific purpose of receiving Marine's payment for the car sets and then passing on those funds, minus its commission and other costs, to Midland-Ross. While the sale proceeds were held by Railway in its own account, Railway held them in a fiduciary capacity and, with the two exceptions noted *supra* (which did not affect the flow of funds from Marine to Midland-Ross), it kept them completely separate from its other funds. Thus, Railway could not have taken equitable title to the funds in the Side Frames and Bolsters account because those funds belonged to Midland-Ross.[19] Moreover, if it had retained all proceeds from the sale, it is clear that it would have been unjustly enriched. Accordingly, the failure to impose a trust in this case would result in Railway receiving not only its $5,000 commission for lending its name to the transaction, but also the entire contract price for the sale of the 100 car sets which belonged to Midland-Ross.[20]

In order to prevail on its constructive trust theory, Midland-Ross, which has the burden of proof, must (1) prove its

---

17. See *In re Investment Sales Diversified, Inc., supra*, 38 B.R. at 450 ("In general, a constructive trust arises where an abuse of a fiduciary relationship to the unjust enrichment of the breaching party is shown.").

18. Although the parties originally contemplated that Railway would act as the disbursing agent for Marine by collecting the money before the goods were shipped by Midland-Ross, the order of payment was later modified. This modification, however, did not alter the terms of the underlying transaction or the nature of Railway's role in that transaction. Railway was still a conduit or broker authorized to collect the funds transmitted by Marine, to deposit the checks in its specially designated account, and then to pay Midland-Ross. Railway continued to hold the funds in implied trust to use them only to pay Midland-Ross its contract price, the freight charges, and the commissions due both it and Ronsco.

19. See *South Central Livestock Dealers, Inc. v. Security State Bank*, 614 F.2d 1056, 1059–61 (5th Cir.1980). In that case, the court found that funds in a separate bank account used by the feedlot as a custodial account for the sale proceeds from its customers' cattle belonged to the feedlot's customers not to the feedlot. On that basis, the court found the trustee of the bankrupt feedlot could not take title to such funds.

20. The Bankruptcy Court's characterization of the relationship between Midland-Ross and Railway as one of a seller and buyer is untenable. No one has ever disputed the fact that Railway was acting as a conduit—a broker for a commission—in the transaction. If Railway were a buyer with respect to Midland-Ross and then a seller to Marine, it would have bargained for a profit—not for a commission. See *General Films, Inc. v. Sanco General Mfg. Corp.*, 153 N.J.Super. 369, 379 A.2d 1042 (1977). The background of the sales transaction confirms that Railway was not acting as a buyer, but was brought in as an agent to lend its name to the transaction, to collect the funds paid by Marine, and to transmit these funds to Midland-Ross.

Even assuming that the relationship between Midland-Ross and Railway was purely contractual, other courts have imposed a constructive trust where the violation of one party's duty was not only a breach of contract but was "borderline fraud" and a violation of a confidence placed on the debtor. See, *e.g., In re Investment Sales Diversified, Inc., supra*, 38 B.R. at 451.

title, (2) identify the trust fund or property, and (3) where the funds or property has been mingled with the general property of the debtor, it must sufficiently trace the property. See 4 *Collier on Bankruptcy, supra,* ¶ 541.13 at 541–71.[21] The Court notes that even in a case where the trust funds are deposited into a general bank account of the debtor, the bankruptcy court may order restitution where the amount of the deposit has at all times, since the intermingling of the funds, equalled or exceeded the amount of the trust fund. 4 *Collier on Bankruptcy, supra,* at ¶ 541.13 at 541–73.[22]

On the basis of the undisputed facts set forth above, the Court finds the funds wired by Marine and placed in Railway's Side Frames and Bolsters account were specifically identifiable and were held by Railway for the benefit of Midland-Ross. Railway never had equitable title to these funds, but was merely a conduit in transferring them from one party to another.[23]

■ Midland-Ross has also satisfied the third of the criteria by tracing the funds. As previously noted, all the funds transferred from Railway to Midland-Ross came from the Side Frames and Bolsters account which was funded entirely with payments from Marine to cover the costs of the 100

car sets and the associated expenses. In order to ensure the direct flow of Marine's payment to Midland-Ross, Railway established and used a special bank account—the Side Frames and Bolsters account. Upon receiving a payment from Marine, Railway would deposit the money in this account.[24] All the funds transferred from Railway to Midland-Ross came from this account and can be traced directly to Marine's transfers to Railway for the payment of Midland-Ross. The Trustee concedes that Railway's only interest in the transaction was to receive a commission for performing its duty of transferring the appropriate funds to Midland-Ross. If Railway had breached its duty to transfer these funds, Midland-Ross could have sued to impose a constructive trust upon the retained funds.

The fact that the parties subsequently modified the initial payment schedule by agreeing to immediate payment upon delivery rather than the strict cash in advance mode of payment is of little to no consequence.[25] The timing or sequence of payments did not change Railway's role in the transaction nor did it abrogate completely the previously established payment arrangements. The parties to the transaction at all times intended that the funds paid to Railway by Marine be used for the sole purpose of paying Midland-Ross and

---

**21.** If under the parties' agreement Railway was free to use the funds as its own and commingle them with its own money, a debtor-creditor relationship would have existed, not a trust relationship. *In re Penn Central Transportation Co.,* 328 F.Supp. 1278, 1279 (E.D.Pa.1971); *In re Sarah Allen Home, Inc.,* 35 B.R. 362, 364 (Bkrtcy.E.D.Pa.1984). But that was not the case here.

**22.** By contrast, if after the intermingling of funds all the money is withdrawn, the equitable trust is lost despite subsequent deposits from other sources in the same account. In those instances where the account is reduced to a smaller sum than the trust fund, the latter is considered dissipated, except as to the balance, and any funds subsequently added from other sources cannot be subjected to the equitable claim of the constructive trust. *Id.*

**23.** Based on its findings that the transfers were made from a bank account in the name of Railway and that the disposition of these funds was at all times under the exclusive control of

Railway, the Bankruptcy Court held that the trustee had made out a *prima facie* case that the funds transferred to Midland-Ross were the property of Railway. Neither the underlying factual findings nor the record support this conclusion. To be sure, Railway held legal title to the funds in the Side Frames and Bolsters account, but only as a trustee. Railway had no beneficial interest in or claim against these funds.

**24.** The Court notes that a relatively small portion of the funds transferred from Marine to Railway were diverted from this account. See note 8, *supra.* However, the funds transferred to Midland-Ross can be traced directly to Marine payments which were deposited in the Side Frames and Bolsters account.

**25.** The Bankruptcy Court relied on this modification to find that the parties had abandoned the payment arrangements set forth in the May 5, 1980 letter from Railway to its bank in Washington, D.C. See note 5, *supra.*

defraying the other expenses. The establishment and use of the specially designated accounts further demonstrates that the initial arrangements made by the parties were never abandoned. The Court finds that Midland-Ross has proved by clear and convincing evidence that the funds at issue were subject to a constructive trust. The sale proceeds held by Railway were clearly the property of Midland-Ross. They were identifiable assets and they were segregated from Railway's other property, creating no tracing problems.

■ Finally, the doctrine of unclean hands presents no bar to the imposition of a constructive trust in this case.[26] To begin with, there is nothing in the record to support the Bankruptcy Court's finding that a direct sale to Marine would violate the licensing arrangements in effect—a fact that Midland-Ross adamantly denies. Rather, the trustee adduced evidence indicating that Ronsco believed that certain licensing restrictions prevented Midland-Ross from making a direct sale to Marine and that Midland-Ross agreed to the transaction as structured by Ronsco "[b]ecause of licensing arrangements."[27] Any belief held by Ronsco as to the propriety of a direct sale transaction is irrelevant, and the "admission" by Midland-Ross that the transaction was structured through a conduit due to certain licensing arrangements is not tantamount to an admission that it was violating restrictions in its license to manufacture and sell Barber-designed car sets.

■ In any event, it is unclear whether the use of a conduit to avoid certain territorial restrictions, assuming that they existed, in a licensing agreement between Midland-Ross and another company could amount to unclean hands particularly where the alleged improper conduct is not directly related to or connected with the transaction on which the Trustee bases his suit. For "[e]ven misconduct connected with the subject-matter of the suit will not defeat relief, where it does not form part of the transaction in controversy." *McClintock on Equity* § 26 at 63 (2d ed.1948). The Trustee's right to avoid the alleged preferential transfers as well as Midland-Ross's right to retain the funds which were held in trust by Railway did not accrue as a result of the alleged misconduct. Rather, the alleged misconduct—the avoidance of territorial licensing restrictions—was collateral to the transfer of funds at issue here and should not defeat Midland-Ross's right to equitable relief. The Court further notes that if in fact the sales transaction was structured to avoid licensing restrictions, Railway itself was a party to and has readily conceded its role in the "inequitable" or "improper" conduct.[28]

For the reasons stated, the Court finds that Railway held only bare legal title to the funds it transferred to Midland-Ross in June and July of 1980, and that the Trustee holds these funds subject to that same interest. Thus, the Trustee has a duty to convey them to their rightful owner, Midland-Ross, as he would clearly be unjustly enriched if he were permitted to retain them.

---

**26.** The Bankruptcy Court found that "the purpose of the structure of the transaction was to avoid licensing arrangements that Midland-Ross believed would make a direct sale to Marine improper." Dec. at 19. On this basis, the court held that "Midland-Ross's conduct makes it ineligible for equitable relief." *Id.*

**27.** Internal Memorandum written by N.D. Bushey, Credit Manager of Midland-Ross' National Casting Division.

**28.** In a number of cases, courts have refused relief to a plaintiff even though the defendant participated in the misconduct, not because it is

a privilege of such defendants but because the courts refused to lend their aid to either party to such transactions. *McClintock on Equity, supra,* § 26 at 65–66, and cases cited therein. But *cf.* 2 *Pomeroy's Equity Jurisprudence* (5th ed. 1941):

> The party to a suit, complaining that his opponent is in court with "unclean hands" because of the latter's conduct in the transaction out of which the litigation arose, or with which it is connected, must show that he himself has been injured by such conduct, to justify application of the principle to the case. The wrong must have been done to the defendant himself and not to some third party.

§ 399 at 99 (citations omitted).

Accordingly, it is this 12th day of July, 1985

ORDERED that plaintiff-appellee's motion for affirmance be and it hereby is denied; and it is further

ORDERED that defendant-appellant's motion for reversal be and it hereby is granted; and it is further

ORDERED that the above-captioned case be and it hereby is remanded to the Bankruptcy Court with instructions to enter judgment in favor of defendant-appellant Midland-Ross.