In re HOWELL ENTERPRISES, INC., Debtor.

TRADAX AMERICA, INC., Plaintiff,

v.

FIRST NATIONAL BANK IN STUTTGART, ARKANSAS, and Howell Enterprises, Inc., Defendants.

Bankruptcy No. HE 88–58M.
Adv. No. 88–170M.

United States Bankruptcy Court,
E.D. Arkansas,
Helena Division.

Sept. 8, 1989.

David Fuqua, N. Little Rock, Ark., for debtor.

Donald H. Henry, Michael Reif, Little Rock, Ark., for Tradax America, Inc.

Steven T. Shults and H. Baker Kurrus, Little Rock, Ark., for First Nat. Bank in Stuttgart.

## MEMORANDUM OPINION

JAMES G. MIXON, Bankruptcy Judge.

On April 4, 1988, Howell Enterprises, Inc., filed a voluntary petition for relief under the provisions of chapter 11 of the United States Bankruptcy Code. On May 9, 1988, Tradax America, Inc., (Tradax) filed a complaint for declaratory judgment, an injunction, to recover money and to obtain equitable relief. A trial was conducted on November 7, 1988, and the case was taken under advisement.

The following shall constitute the Court's findings of facts and conclusions of law pursuant to Rule 7052. The matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(E), (K) and (O), and the Court has jurisdiction to enter a final judgment.

The debtor is an Arkansas corporation which was engaged in the business of buying, selling, storing and milling rice. On June 20, 1986, the debtor borrowed $2,100,000.00 from First National Bank in Stuttgart, Arkansas, (FNB) and executed two promissory notes in the amounts of $1,900,000.00 and $200,000.00, respectively. Both notes were to be repaid in monthly installments. To secure repayment of the notes, the debtor executed a security agreement granting a security interest in favor of FNB in "all accounts receivables ... now on hand and hereafter acquired." Financing statements were properly recorded and the liens were properly perfected. FNB made no additional loan advance to the debtor after the initial advance in 1986.

Tradax, a New York corporation, is a subsidiary of Cargill International.[1] Tradax is engaged in the business of buying and selling rice in the United States and abroad. In 1987 Tradax was the debtor's largest customer and transacted business

---

1. Tradax is now known as Cargill Rice, Inc.

with the debtor frequently. Tradax bought rice from and sold rice to the debtor; the debtor stored rice and milled rough rice for Tradax. Tradax's rice, being a fungible commodity, was commingled with other rice at the debtor's facilities.

Tradax and the debtor conducted business on an informal basis, and Tradax typically did not obtain documents of title for its rice which was stored by the debtor. During the course of their business dealings, it was not uncommon for the debtor and Tradax to be indebted to each other in different amounts for different transactions. If the debtor were indebted to Tradax for a particular transaction, the obligation sometimes would be satisfied by the debtor's milling a load of rice for an agreed credit against the toll milling fees due the debtor. Sometimes the parties set off the amounts they owed each other and other times the debtor or Tradax was paid the difference.

In February 1987, Jackson, Son & Co. (Jackson), an international commodities brokerage company, contacted the debtor to see if it would be interested in selling a load of brown rice to an Israeli company named Bar Schwartz Ltd. (Bar Schwartz). The payment by Bar Schwartz was to be made one year from the shipping date and secured by a letter of credit. The debtor was not interested in the transaction because it did not want its money tied up for a year. The debtor contacted Tradax to see if it would be interested in making the sale and suggested that Tradax and Jackson communicate directly about the transaction. Tradax was interested in the sale but was concerned that Bar Schwartz would not buy rice from an international trading company such as Tradax. Tradax, Jackson, and the debtor, at Tradax's direction, agreed orally that Tradax would make the sale but that the transaction would be documented as a sale from the debtor to Bar Schwartz and not a sale from Tradax.

On February 25, 1987, a written contract for the sale of 1,250 tons of U.S. long grain rice was entered into between the debtor, as the seller, and Bar Schwartz, as the buyer. In April 1987, the debtor loaded the milled rice into trucks at its facility at Forrest City or Stuttgart, Arkansas,[2] and transported it to Helena, Arkansas, where it was loaded on a barge for shipment down the Mississippi River to be loaded on an oceangoing vessel.[3]

A short time later, Tradax determined that the ship downriver would arrive late which meant additional costs would accrue for demurrage. Tradax found another trading company (Sunrice, Inc.) with a facility in Louisiana which needed rice and a swap was arranged.[4] After the swap, the new rice proceeded by barge to Convent, Louisiana, where it was loaded aboard the vessel Great Universe. All of the shipping documents from Helena to Sunrice to Convent showed Tradax as owner of the rice, but the bill of lading issued for the rice when placed aboard the Great Universe showed the shipper/exporter as the debtor. All of the expenses of the transaction, including the brokerage commission, were paid by Tradax, but were documented in the name of the debtor. The rice was transported to a port in Israel and delivered to the order of Bar Schwartz. There was no indication in the record that Bar Schwartz was dissatisfied in any way with its purchase.

As a result of the transaction, the debtor created an invoice for the purchase price of

---

**2.** The debtor's witness was not sure which facility was used.

**3.** The evidence is in dispute as to who owned the rice at the time it was identified to the contract. A witness for the debtor testified that the rice was inventory of the debtor which was in effect sold to Tradax for credit against toll milling fees. Tradax's witness testified that the rice belonged to Tradax and was only stored at the debtor's facility. Both parties are apparently satisfied that an appropriate credit was given

because neither has a claim against the other arising out of this transaction.

**4.** The swap was described as an agreement whereby the rice loaded at Helena was sold to Sunrice on May 13, 1987, for $194,219.23 in exchange for a promise to sell back to Tradax a like quantity of the same quality rice on May 18, 1987, for $193,242.00. The swap was accomplished without difficulty.

the rice in the name of Bar Schwartz as purchaser, and the invoice created an account receivable due in May 1987, for $262,962.00 which was posted to the debtor's books in the regular course of business. The debtor documented its obligation to Tradax by listing it on its books as an account payable. Tradax documented the transaction on its books as a sale by Tradax to the debtor.

On June 18, 1987, the debtor presented to Chase Manhattan, with all necessary documents, the letter of credit which named the debtor as beneficiary. The debtor and Tradax contemplated that the debtor would secure payment for the rice in May 1988 when the letter of credit matured, deposit the money in the debtor's account and either pay Tradax the proper amount or give Tradax a credit by way of setoff or milling rights.

FNB had no knowledge of the Bar Schwartz transaction until August 1987. On April 4, 1988, the debtor filed its chapter 11 petition. FNB claims a lien in the account receivable created by the Bar Schwartz transaction while Tradax maintains that the account receivable is not property of the estate, that the debtor held legal title subject to a constructive trust in favor of Tradax, and that the debtor could not grant a lien to FNB in its property under these facts. The debtor does not claim the account receivable as its property and agrees that it belongs to Tradax. After the letter of credit matured and this dispute arose, the receivable was converted to cash which was placed in the registry of the Court pending the outcome of this litigation.

I

■ 11 U.S.C. § 541(a) provides that property of the debtor's estate includes all legal and equitable interests of the debtor in property as of the commencement of the case. The nature and extent of the debtor's interest in property are determined by state law. *Butner v. United States*, 440 U.S. 48, 55, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979); *N.S. Garrott & Sons v. Union Planters Nat'l Bank of Memphis (In re*

*N.S. Garrott & Sons)*, 772 F.2d 462, 466 (8th Cir.1985). Federal bankruptcy law dictates to what extent that interest is property of the estate. *N.S. Garrott*, 772 F.2d at 466. The estate has no greater rights in the property that those held by the debtor prior to bankruptcy. *Id.* at 467.

It is immaterial whether the rice was originally stored by the debtor for Tradax or purchased by Tradax for a credit of milling time because the debtor and Tradax agree and there is no evidence to the contrary that at the time the rice was identified to the contract and placed on the barge at Helena the consideration from each had been satisfactorily exchanged.

■ A constructive trust is an equitable remedy imposed by the court to confer on the true owner of property the equitable interest in the property superior to that of the owner of the legal title. *N.S. Garrott*, 772 F.2d at 467; *Horton v. Koner*, 12 Ark.App. 38, 43, 671 S.W.2d 235, 238 (1984); *Andres v. Andres*, 1 Ark.App. 75, 81, 613 S.W.2d 404, 407–08 (1981). The purpose of a constructive trust is to prevent unjust enrichment. *N.S. Garrott*, 772 F.2d at 467; *Horton v. Koner*, 12 Ark.App. at 44, 671 S.W.2d at 239; *Restatement of Restitution* § 160 (1937). The general rule, as stated by the Arkansas Supreme Court, is that:

> [W]henever the legal title to property, real or personal, has been obtained through actual fraud, misrepresentations, concealments, or through undue influence, duress, taking advantage of one's weakness or necessities, or through any other similar means or *under any other similar circumstances which render it unconscientious for the holder of the legal title to retain and enjoy the beneficial interest*, equity impresses a constructive trust on the property thus acquired in favor of the one who is truly and equitably entitled to the same[.]

*Bragg v. Hartney*, 92 Ark. 55, 59, 121 S.W. 1059, 1060 (1909) (emphasis added). Proof of fraud is not essential to establish a constructive trust. *Horton v. Koner*, 12 Ark.App. at 43, 671 S.W.2d at 238. *See In re Auto–Train Corp.*, 53 B.R. 990, 995–96

(D.D.C.1985); *Simmons Nat'l Bank v. Dalton*, 232 Ark. 359, 362–63, 337 S.W.2d 667, 669–70 (1960); G. Bogert, *Trusts* § 77, at 287 (6th ed. 1987). Before a constructive trust may arise, there must be a "res" to which the trust can attach. *Restatement of Restitution* § 160 comment i. The facts of this case justify the imposition of a constructive trust in favor of Tradax. The consideration for the account receivable was rice which was property of Tradax. The debtor had only bare legal title to the account receivable at the time of filing its chapter 11 case.

■■■ When a constructive trust is created, the beneficiary of the trust is entitled, in most circumstances, to have his rightful interest restored and to be reestablished in his title. *N.S. Garrott*, 772 F.2d at 467. *See American Nat'l Bank v. Federal Deposit Ins. Corp.*, 710 F.2d 1528, 1541 (11th Cir.1983). When the trust assets are transferred to a third party, enforcing the trust becomes more difficult. When assets of a trust are improperly transferred by the trustee, the beneficiary may trace these assets and recover them from the transferee provided the transferee is not a bona fide, or good faith, purchaser for value. *Moore v. Oates*, 143 Ark. 328, 335, 220 S.W. 657, 659 (1920); *Ussery v. Ussery*, 113 Ark. 36, 39, 166 S.W. 946, 947 (1914); *Bragg v. Hartney*, 92 Ark. at 59, 121 S.W. at 1060. *See Turley v. Mahan & Rowsey, Inc. (In re Mahan & Rowsey, Inc.)*, 817 F.2d 682, 684 (10th Cir.1987); *Rieth–Riley Constr. Co. v. First Security Bank (In re William Bros. Asphalt Paving Co.)*, 59 B.R. 71, 75 (Bankr.W.D.Mich.1986); *Restatement (Second) of Trusts* § 284 (1959). A bona fide purchaser is "[o]ne who acquires for value a legal interest in [the trust] property without notice that there is an outstanding trust or other equitable interest in the property in question [and] may hold it free of such equitable interest." G. Bogert, *Trusts* § 165, at 597. One reason for the existence of the bona fide purchaser rule is:

> ... commercial expediency based upon the policy of making property freely alienable and permitting purchasers to rely on appearances; ... commercial expediency is undoubtedly the principal

foundation of the related holder in due course and recording act rules and may be a valid basis for application of the bona fide purchaser rule.

*Id.* at 599. *See also Woodrow v. Riverside Greyhound Club, Inc.*, 192 Ark. 770, 772–73, 94 S.W.2d 701, 702 (1936); *Rubel v. Parker*, 107 Ark. 314, 320–21, 155 S.W. 114, 117 (1913); *Sorrells v. Sorrells*, 4 Ark. 296, 301 (1842).

■■■ Tradax argues that FNB is not a bona fide purchaser for value because it did not advance credit after the creation of the trust and therefore could not have relied to its detriment on the existence of the disputed account. FNB argues that under settled principles of state law, it occupies the status of a bona fide purchaser for value under the facts of the case.

By taking its security interest by mortgage, pledge or lien, FNB is considered, under Arkansas law, to be a purchaser of the security interest in the Bar Schwartz account receivable. *See* Ark.Code Ann. § 4–1–201(32) and (33). There was no allegation of any lack of good faith on the part of FNB; therefore, the only question remaining is whether FNB was a purchaser "for value."

The debtor's right to secure payment from Bar Schwartz is an account, which is defined as any right to payment for goods sold. Ark.Code Ann. § 4–9–106 (1987); *Benton State Bank v. Warren*, 263 Ark. 1, 5, 562 S.W.2d 74, 75–76 (1978). Under Ark. Code Ann. § 4–9–203, FNB's security interest in the Bar Schwartz account could attach and become enforceable only when the debtor had signed a security agreement describing the account, FNB had given value for its security interest in the account, and the debtor had obtained rights in the account. *See Findley Machinery Co. v. Miller*, 3 Ark.App. 264, 268, 625 S.W.2d 542, 544 (1981). The security agreement executed by the debtor granted FNB a security interest in after-acquired accounts receivable. *See* Ark.Code Ann. § 4–9–204. Although the value (loan proceeds) given by FNB was extended at the time of the execution of the security agreement, Ark. Code Ann. § 4–9–108 provides that a secur-

ity interest in after-acquired property is deemed to be taken for new value, and not as security for an antecedent debt, if the debtor acquires its rights in the property in the ordinary course of business. *See Steinberg v. American Nat'l Bank & Trust Co. (In re Meyer–Midway, Inc.)*, 65 B.R. 437, 445 (Bankr.N.D.Ill.1986); Note, *Commercial Transactions—Secured Transactions Under the Uniform Commercial Code—Section 9–108*, 22 Ark.L. Rev. 501, 504–05 (1968). Since that requirement was met under the facts in this case, FNB's security interest in the Bar Schwartz account attached as soon as the debtor acquired its right to payment under the account. FNB's security interest was properly perfected by the filing of financing statements soon after execution of the security agreement; therefore, the security interest in the after-acquired Bar Schwartz account became perfected when the account was created. Ark.Code Ann. § 4–9–303(1). *See Bank of the West v. Commercial Credit Financial Services, Inc.*, 852 F.2d 1162, 1167 (9th Cir.1988).

FNB, therefore, was the holder of a validly perfected lien in all of the debtor's accounts receivable which existed on the day the appropriate financing statements were filed and in any account receivable which came into existence during the effective life of the financing statements. When the Bar Schwartz account receivable payable to the debtor was created, the receivable, although subject to a constructive trust in favor of Tradax, also became subject to FNB's security interest in after-acquired accounts receivable. However, as outlined above, FNB has all of the prerequisites of a bona fide purchaser for value of a lien in the Bar Schwartz account receivable. *See MBank–Waco v. L. & J., Inc.*, 754 S.W.2d 245, 250–51 (Texas Ct.

App.1988). As such, FNB's interest defeats any equitable interest that Tradax holds as beneficiary of a constructive trust. *Id.*[5]

## II

Alternatively, Tradax argues that if FNB's interest is determined to have priority over Tradax's interest, FNB will be unjustly enriched at the expense of Tradax because the receivable is not the debtor's property and it is inequitable that Tradax's property be used to satisfy the debtor's debt. However, as the court stated in *American Nat'l Bank v. Federal Deposit Ins. Corp.*, 710 F.2d 1528, 1541 (11th Cir. 1983), "[T]he purpose of the constructive trust is to prevent the unjust enrichment of the more culpable of the parties." As between FNB and Tradax, Tradax is more culpable. It was Tradax, after all, which deliberately masked the transaction in false documents to deceive Bar Schwartz. Tradax has the same responsibility as FNB to comply with the requirements of the Uniform Commercial Code and its rules regarding perfection of liens. There are overriding policy reasons for insulating a secured creditor's lien rights in after-acquired property from attack by unrecorded claims similar to the claim asserted here. Without this priority, after-acquired property would be useless as collateral. The result achieved here appears to be the result intended by the drafters of the Uniform Commercial Code. Occasionally, interpretation of the various provisions of the Code results in harsh and unintended results, but here the party who will suffer is the party whose negligence and whose lack of good faith required by Ark.Code Ann. § 4–1–203 created the ambiguity in

---

**5.** Numerous courts have upheld the status of a perfected secured creditor with an interest in after-acquired property as a bona fide purchaser for value against the equitable rights of a reclaiming seller, which are similar to the equitable rights of a beneficiary of a constructive trust. *See Lavonia Mfg. Co. v. Emery Corp.*, 52 B.R. 944, 946–47 (E.D.Pa.1985). *Accord Shell Oil Co. v. Mills Oil Co.*, 717 F.2d 208 (5th Cir. 1983); *Toyota Industrial Trucks USA, Inc. v.*

*Citizens Nat'l Bank of Evans City*, 611 F.2d 465 (3d Cir.1979); *Los Angeles Paper Bag Co. v. James Talcott, Inc.*, 604 F.2d 38 (9th Cir.1979); *Stowers v. Mahon (In re Samuels & Co.)*, 526 F.2d 1238 (5th Cir.), *cert. denied*, 429 U.S. 834, 97 S.Ct. 98, 50 L.Ed.2d 99 (1976); *Action Industries, Inc. v. Dixie Enterprises, Inc. (In re Dixie Enterprises, Inc.)*, 22 B.R. 855 (Bankr.S.D.Ohio 1982).

the first place.[6] *See Thompson v. United States*, 408 F.2d 1075, 1084 (8th Cir.1969).

The lien of FNB is deemed to have priority over the ownership claim of Tradax. A separate judgment pursuant to Bankruptcy Rule 9021 will be entered.

IT IS SO ORDERED.

John Harmelink, Yankton, So. Dak., for Ronald and Ruth Colsden.

A. Frank Baron, Sioux City, Iowa, trustee.

Monte Schatz for trustee.

Thomas Carney, Chicago, Ill., and David L. Baker, Cedar Rapids, Iowa, for Moorman Manufacturing.

---

**6.** Stated another way by J. White & R. Summers, *Uniform Commercial Code* § 26–20, at 554–55 (3d ed. 1988) "Better to leave an occasional widow penniless by the harsh application of the law than to disrupt thousands of other transactions by injecting uncertainty and by encouraging swarms of potential litigants and their lawyers to challenge what would otherwise be clear and fair rules."