Harold E. WILLIAMS and Brenda WILLIAMS
*v.* Larry COTTEN

CA 82-496                                   658 S.W.2d 421

Court of Appeals of Arkansas
Division II
Opinion delivered October 19, 1983

*Smith & Nixon*, by: *Griffin Smith* and *Griffin Smith, Jr.*, for appellants.

*Phillip J. Taylor*, for appellee.

TOM GLAZE, Judge. This appeal arises from appellants' action for specific performance, or, in the alternative, for return of $20,000 the appellants paid to appellee. Both below and on appeal, the parties have disputed the nature of the contract which was the basis for this action. The appellants, the Williams, contend the parties signed an offer and acceptance to purchase the appellee's home; appellee, Cotten, contends they signed an option agreement whereby the Williams paid consideration for a nine-and-one-half month option to purchase Cotten's home. The chancellor found that the parties had entered into an option agreement, that the Williams never exercised their option to purchase the property, and that they paid $20,000 consideration for the option which was to be applied toward the purchase price only in the event the option was exercised. The chancellor denied specific performance and ruled that Cotten was entitled to retain the $20,000.

On appeal, the appellants contend the chancellor erred in her findings and ask this Court to reverse and to order Cotten to return the $20,000 to the Williams.

Some of the facts are undisputed. Cotten is a general contractor and a real estate broker. Mr. and Mrs. Williams are husband and wife who, at the time the parties contracted, lived in Dhahran, Saudi Arabia, where Mr. Williams was a tool testing engineer with an oil company. The parties met in August, 1980, when the Williams were on vacation in the

United States visiting Mrs. Williams' sister in Fort Smith. The Williams were looking for a house to buy because they intended to return to Fort Smith in the summer of 1981 when Mr. Williams' job in Saudi Arabia was to terminate. The Williams drove past Cotten's home and saw a "For Sale" sign propped up against the house. They phoned the number on the sign and inquired whether the house was for sale. Cotten invited the Williams to his home to discuss a possible sale. At that initial meeting, Cotten agreed that he would be amenable to selling the house. The parties discussed a selling price of $120,000. The Williams revealed that they had $20,000 to invest, and Cotten told them that his equity in the house was $50,000. He was willing to take their $20,000 "down" and to carry a second mortgage for the $30,000 balance of his equity. The Williams decided they wanted the house.

At their first meeting, the parties discussed financing. At the time, uncertainty existed in Arkansas with respect to the enforceability of due on sale clauses. Interest rates were rising, and lending institutions were summarily raising interest rates when purchasers assumed loans secured by mortgages containing due on sale clauses — as was the situation here. Consequently, Cotten apprised the Williams that they might not be able to assume his loan with Superior Federal at the existing rate of nine-and-three-quarters percent.

The Williams left Cotten's home after that first meeting with the understanding, according to Cotten's testimony, that "they would get back with me later and let me kow if they were interested in going ahead and purchasing the house." That same evening, the Williams returned to Cotten's home, told him they had decided they wanted to purchase the house, and asked him how they could work it out. Cotten testified that he told them:

> At that point what . . . I could do was take $20,000 down and carry the balance of it . . . for a ten year period of time. . . . [I]t was still up in the air as to whether or not they could ever assume that 9 and 3 quarter percent loan . . . because nobody knew what the savings and

loans were going to do. Nobody knew what the courts were going to do. We . . . hoped that they would find that due on sale clauses were not enforceable for that specific reason. But . . . there's no way I could guarantee them anything other than I would do everything for them I could at that point. And as according to the year, everything they said is very true, about me staying in the house there now. I said we could on a . . . on an option. You have a one year option to purchase this home. That will allow me to stay in the home, continue to get the income tax benefits of home ownership. I don't want to have to rent a place. So, we can do it under one year option. They'd already stated they'd be back June 1st, and we'd close the deal. . . . That's how the option came about. . . .

The Williams were to return to Saudi Arabia within the week after the parties first met. Therefore, they were anxious to complete the paperwork before they left, and they agreed to meet the following morning, August 14, 1980, to fill out the necessary documents. They met at Cotten's Century 21 real estate office. Cotten had filled out a preprinted form entitled "Offer and Acceptance" and it had all pertinent information typed in, except for a date and an amount of "earnest money." Special provisions and conditions were completed. The parties did not sign this "Offer and Acceptance" form but did sign the back side of the form on which Cotten typed the following:

## OPTION

In consideration of the payment by the under-signed optionee in the amount of $20,000.00, receipt of which is hereby acknowledged, optioner grants to optionee an option to purchase the real property described in the agreement of sale on the reverse side upon all the terms and conditions set forthe [sic] therein. If not exercised, this option shall expire June 1, 1981. The option shall be exercised by mailing or delivering written notice to the optionor prior to the expiration of this option. Notice, if mailed, shall be by certified mail, postage prepaid, to ghe [sic] optionor at

the address set forth below, and shall be deemed to have been given upon the day following the day shown on the postmark of the envelope in which such notice is mailed.

In the event the option is exercised, the said sum of $20,000.00 shall be credited upon the purchase price.

In the event the option is exercised, the Agreement of sale on the reverse side shall be effective as if the offer and acceptance thereof had both been made upon the date the option is exercised.

After signing the above document on August 14, 1980, the Williams returned to Saudi Arabia. The parties maintained contact, primarily with respect to the financial situation and the interest rates in Arkansas in the months following the signing of the contract. It is undisputed that Cotten attempted to provide loan information to Williams. He had Superior Federal mail a loan application packet to the Williams in March, 1981, although the Williams contended at the hearing below that they did not receive that packet until late June, just before Mrs. Williams returned to the United States.

The events of June and July of 1981 are in dispute. What is clear is that Mrs. Williams returned to Fort Smith in early July, 1981, prior to the date her husband returned, around August 1, 1981. It is also clear that Cotten twice extended the expiration date of their agreement, first to July 1, 1981, and then to August 22, 1981, conditioned upon the Williams' paying the house notes and the utilities for July and August, 1981. It is undisputed that Cotten built a new home and moved from the subject property into the new house sometime in July, 1981.

After Mrs. Williams returned to Arkansas, she negotiated with Superior Federal for a loan. She applied for a loan at twelve-and-seven-eighths percent, even though the loan officer told her the current rate was four points higher than appellee's existing loan rate, *viz.*, thirteen-and-three-quarters percent. Superior Federal approved the Williams to assume Cotten's loan, at that higher rate, but Mr. and Mrs. Williams decided they could not pay that much interest for

their loan and told Cotten they were unable to go through with their deal. The Williams contend that it was at this point that Cotten apprised them of his intention to keep the $20,000 if they failed to exercise their option. Until this time, the Williams contend that Cotten had told them more than once that if the deal did not work out, he would return their $20,000. To the contrary, Cotten and his wife denied that any promise was made to return the $20,000. In fact, Cotten testified that he had read aloud to the Williams from his *Realty Bluebook* that consideration for an option is a nonrefundable payment one makes to purchase an option. This conflict in testimonies leads us to the central issue dispositive of this case: Whether the parties entered into an option agreement or an offer and acceptance agreement.

It is well settled that although we review chancery cases *de novo* on the record, we do not reverse a decree unless the chancellor's findings are clearly erroneous or clearly against a preponderance of the evidence. Since the question of preponderance turns heavily on the credibility of the witnesses, we defer to the superior positon of the chancellor in this regard. *Andres* v. *Andres,* 1 Ark. App. 75, 613 S.W.2d 404 (1981); Ark. R. Civ. Pro. 52 (a). If the chancellor is correct for any reason, we affirm the decision. *Moore* v. *City of Blytheville,* 1 Ark. App. 35, 612 S.W.2d 327 (1981). In the instant case, we find the chancellor's findings clearly against the preponderance of the evidence for the reasons we shall set out below.

In reaching her decision, the chancellor heard testimony from the parties concerning the making of their agreement and the events surrounding it. The relationships of the parties and their dealings before and after they contracted is important to an understanding of exactly what their agreement was. In *Schnitt* v. *McKellar,* 244 Ark. 377, 427 S.W.2d 202 (1968), the Supreme Court set out the following rules:

> In construing a contract the court must, if possible, give effect to the intention of the parties as far as that can be done consistently with legal principles, and this intention must be ascertained from the whole

contract. *Dent* v. *Industrial Oil & Gas Co.,* 197 Ark. 95, 122 S.W.2d 162; *American Snuff Co.* v. *Stuckey,* 197 Ark. 540,. 123 S.W.2d 1063.

To arrive at the intention of the parties to a contract, courts may acquaint themselves with the persons and circumstances and place themselves in the same situation as the parties who made the contract. *American Snuff Co.* v. *Stuckey, supra.* This is so the court can view the circumstances as they viewed them, so as to judge the meaning of the words and the correct application of the language to the things described. *Taylor* v. *Taylor,* 240 Ark. 376, 399 S.W.2d 498. The court should arrive at the sense in which the words used would naturally be understood, taking into consideration the circumstances surrounding the making of the contract, the situation and relation of the parties. *Scrinopskie* v. *Meidert,* 213 Ark. 336, 210 S.W.2d 281.

*Schnitt* v. *McKellar,* 244 Ark. at 385, 427 S.W.2d at 207.

The chancellor found that the Williams and Cotten made a valid option agreement for which the Williams paid $20,000 consideration. The Supreme Court has defined an option as follows:

Now, an option is not a sale. It is not a contract by which one agrees to sell and the other to buy. It is only an offer by one to sell within a limited time and a right acquired by the other to accept or reject such offer within such time. When this privilege is exercised by acceptance, then and not until then does it become a contract of sale. Instead of being a sale, an option excludes the right to sell during its life. In the case of *Black* v. *Maddox,* 104 Ga. 157, an option is defined to be "the obligation by which one binds himself to sell and leaves it discretionary with the other party to buy . . . simply a contract by which the owner of property agrees with another person that he shall have the right to buy the property at a fixed price within a certain time." . . . An option is, therefore, *easily distinguished from a contract of sale. . . .*

*Swift* v. *Erwin,* 104 Ark. 459, 148 S.W. 267, 269 (1912) (citations omitted) (emphasis supplied).

The major problem in this case is that the agreement signed by the parties is not easily distinguished from a contract of sale. In sum, one side of the written agreement is captioned "OPTION," and the opposite side reflects a standard offer and acceptance form. The chancellor recognized that an ambiguity existed and permitted testimony to attempt to dispel that ambiguity. While we find the chancellor was correct in admitting such evidence, we fail to find in the record that the chancellor applied the well-settled rule that any ambiguity in a contract must be construed against the party who drafted it. *Barrett Real Estate* v. *Land Mart of America, Inc.,* 3 Ark. App. 70, 73, 621 S.W.2d 889, 891 (1981). We find the rule particularly applicable when, as here, one party to the contract was a real estate broker, admittedly knowledgeable in transactions such as the one into which he entered with appellants. Cotten prepared the agreement, and it was he who suggested an option agreement and purportedly explained it to the Williams.

Looking at the circumstances surrounding the agreement, the parties' actions subsequent to the agreement, and the agreement itself — both the "Option" and the "Offer and Acceptance" — we conclude that the parties, particularly the Williams, treated the transaction as an offer and acceptance. Although Cotten contends that he intended to sell an option for $20,000, his actions, evidenced by his own testimony, belie those contentions.

Even at the hearing below, Cotten referred to the money as a down payment. He referred to the Williams' "purchase of the house." He testified that he sought a financing plan for the Williams after they returned to Saudi Arabia, a seemingly premature action for one to take if a decision to purchase had not yet been made. Cotten also finished the garage and steps, and installed a French drain grating, which were conditions noted under paragraph thirteen of the offer and acceptance.

Cotten attempts to justify the $20,000 amount as consideration, arguing it was for an option based upon his

having to build a new house in order to vacate his house for the appellants. However, the flip-side of that argument is that his having built a new house and vacating the old one are actions which also indicate an actual sale of the property.

Scrutinizing the relationship between the Williams and Cotten, we find the evidence reflects they were strangers until this real estate transaction. Cotten, a real estate broker, prepared the contract in question, and according to his and the Williams' testimonies, Cotten acted on behalf of the Williams, assisting them in a number of ways. For example, he worked to attain financing for the Williams, and in so doing, had his lending institution send them a loan packet which included an application reflecting a "deposit" of $20,000. When Mrs. Williams returned to the United States in July, 1981, Cotten telephoned his lender to make an appointment for her, and he accompanied her to the meeting. Cotten gave Mrs. Williams a key to the house, and he also agreed to be the Williams' agent in leasing the house when it appeared that they would remain in Saudi Arabia until the summer of 1982. When Mrs. Williams phoned Cotten to tell him they would not be buying his house, she even asked him at that point to help them find another house when they returned to Fort Smith the next year. Although he indicated Mrs. Williams' request "stunned" him, he agreed to help find another home. In sum, Cotten ostensibly represented the Williams' interests in selling his home, even though he testified he was working in his own behalf.

A well-settled equitable principle has been set out as follows by the Supreme Court:

"[E]quity regards the substance rather than the form, or . . . equity regards the substance and intent, not the form. . . . "

. . .

Equity looks beyond the mere form in which the transaction is clothed and shapes its relief in such way as to carry out the true intent of the parties to the agreement, and to this end all the facts and circumstances of the transaction, the conduct of the parties

thereto, and their relations to one another and to the subject-matter, are subjects for consideration.

*Maners* v. *Walsh,* 180 Ark. 355, 362-63, 22 S.W.2d 12, 14-15 (1929) (quoting 21 C.J. 204-05), *aff'd after remand,* 182 Ark. 885, 33 S.W.2d 718 (1930). *See also Coleman* v. *Volentine,* 211 Ark. 594, 201 S.W.2d 592 (1947).

In looking beyond the form of this transaction to the conduct of the parties and their relation to one another and to the property, *Maners* v. *Walsh, supra,* the evidence reveals the parties treated this entire matter as if it were a sale, not merely an option to purchase. Accordingly, we conclude the $20,000 that the Williams paid Cotten was not consideration for an option agreement which he is entitled to retain. On that point, we find the chancellor's findings clearly erroneous and therefore reverse.

Our decision does not preclude the possibility of the award of damages for breach of contract. However, from our *de novo* review of the record, we are unable to determine whether appellee is entitled to damages because evidence on damages was not presented to the chancellor. Therefore, we remand this cause to allow the chancellor to hear evidence on the question of damages and to render a decision consistent with this opinion.

Reversed and remanded.

CRACRAFT and CLONINGER, JJ., agree.