851 F.2d 193
 11 Fed.R.Serv.3d 767
 Clift C. LANE, Individually and as Trustee under the Clift
C. Lane Revocable Trust and as Trustee under the Dorothy P.
Lane Trust, and Dorothy P. Lane, Individually, and as
Trustee under the Dorothy P. Lane Revocable Trust and as
Trustee under the Clift C. Lane Trust, Appellees,
v.
John E. PETERSON, Jr., Walter W. Minger, and Edward H.
Covell, each Individually, and as Members of the Special
Panel for the Lane Processing, Inc., under a Consolidated
Plan of Reorganization for Clift C. Lane and Dorothy P. Lane
and Land Affiliates as filed with the United States
Bankruptcy Court for the Middle District of North Carolina,
Greensboro Division, and as Trustees under a Declaration of
Trust dated July 22, 1985, and John E. Peterson, Jr.;
Walter W. Minger; and Edward H. Covell, as Representatives
of the unknown Beneficiaries under a Declaration of Trust
dated July 22, 1985, Appellants.
 Nos. 87-2073, 87-2366.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Jan. 11, 1988.
Decided June 30, 1988.
Rehearing Denied Aug. 2, 1988.
As Amended Oct. 4, 1988.
 
 Charles Hlavinka, Texarkana, Tex., for appellants.
 Ronald A. May, Little Rock, Ark., for appellees.
 Before JOHN R. GIBSON and MAGILL, Circuit Judges, and BRIGHT, Senior Circuit Judge.
 JOHN R. GIBSON, Circuit Judge.
 
 
 1
 Clift and Dorothy Lane, after serious business reversals and bankruptcy, transferred the stock in their several corporations to a panel established by their reorganization plan. The panel, John Peterson, Jr., Walter W. Minger and Edward H. Covell, sold the stock for $35 million less than one year after the transfer, and the Lanes filed this diversity action seeking to recover the stock or participate in the sale proceeds. Following a five-day bench trial, the district court[1] denied all relief. On appeal, the Lanes argue that the district court erred in failing to impose a constructive trust on the sale proceeds. Peterson, Minger and Covell cross-appeal, arguing that the court erred in failing to impose Rule 11 sanctions against the Lanes. We affirm the judgment entered by the district court and the denial of sanctions.
 
 
 2
 The Lanes, devoted some 35 years to creating and developing their poultry business. They organized and were the initial subscribers to all of the stock of the "Lane Companies."[2] In the early 1980's the Companies experienced severe financial problems and the Lanes and the Lane Companies filed petitions for reorganization under Chapter 11 of the United States Bankruptcy Code. A plan for reorganization approved by the bankruptcy court in July 1984 provided for the appointment of a Special Panel which was given the responsibility and authority to aid in the operations of the Lane Companies. If default occurred, the Panel would succeed to the powers and duties of the Companies' Board of Directors and the Companies would receive an additional 30-day cure period.
 
 
 3
 The Lanes selected Peterson, Minger and Covell to serve on the Special Panel. Following their appointment, the Lanes continued to operate the Companies. The Panelists performed their duties as specified in the plan, recommending several changes to the Lanes regarding the operations of the Companies, but the Lanes rejected their advice.
 
 
 4
 From the confirmation of the plan through June 1985 the Companies' losses escalated. By the end of June the stockholders' equity in the Companies fell to a negative $8.2 million, with losses for the last twelve months exceeding $8.9 million.[3] In early July 1985 it became apparent that the Companies could not meet the scheduled payments under the plan and that default, which would occur on August 2, 1985, was inevitable. Because the Lanes had executed personal guarantees to secure much of the needed capital for operations, personal assets of the Lanes, valued at more than $1 million would be subject to creditors' claims. In a letter dated July 5, William Sullivan, counsel for the Lanes and the Lane Companies, advised the Lanes that it would be in their "personal financial interest to turn the Companies over to the Special Panel in the best condition possible so that the Special Panel would have a chance to avoid liquidation." Dorothy Lane suggested to Peterson that if she and Clift could be released from the personal guarantees, they would relinquish control of the Companies. The Lane Company creditors considered, but rejected, this proposal in the early part of July.
 
 
 5
 The Special Panel and the Lanes met on July 2, 1985, to discuss cash flow problems, as well as Notices of Default received by the Lanes. Dorothy Lane testified that after the meeting, she and Peterson secretly met to discuss a proposed transfer of stock and managerial responsibility to the Panel. She testified that Peterson assured her that the Panel "did not want her money" and that the stock, if transferred, would be held for her and Clift as beneficial owners. Dorothy Lane told no one, including her husband, about this alleged agreement. Peterson denied that he told Mrs. Lane that the stock would be held for the Lanes as beneficial owners. The district court specifically found that Dorothy Lane's testimony lacked credibility.
 
 
 6
 On July 17, 1985, the Panel met and agreed that they would accept an early takeover of the Companies, as requested by the Lanes, if the Lanes relinquished all control and power in the Companies, including a transfer of all their stock.[4] The Panel conveyed their proposal to Sullivan, who immediately contacted Dorothy Lane. While the Panel was still meeting, Sullivan relayed the Lanes' acceptance of the proposal.
 
 
 7
 The initial proposal was to "turn the stock back to the Companies." However, after assessing the ramification of such a transaction, Sullivan realized that the Companies could not operate without outstanding stock. Thus, Sullivan suggested transferring the stock to the Panelists as trustees under a Declaration of Trust for the benefit of the Lane Company employees. This idea was not conveyed to the Lanes.
 
 
 8
 Sullivan prepared the necessary documents to execute the transaction and the agreement was formalized at the Company offices on July 22, 1985. Sullivan explained each document to the Lanes who had the opportunity to ask any questions.[5] The Lanes resigned as officers and directors of each of the corporations and Peterson, Minger and Covell were elected to these positions. A consulting agreement executed between the Lanes and the Lane Companies provided each of the Lanes with $100,000 in return for a one-year consulting arrangement. The Lanes executed a Stock Transfer agreement transferring their stock to the Panelists as trustees under a Declaration of Trust. The Declaration of Trust was executed only by Peterson, Minger and Covell. Peterson denied the Lanes' request to see a copy of the trust instrument "because it did not pertain to the Lanes and it was not a document they needed to review or sign." After the closing Dorothy Lane stated, "better that the Companies go down with you than with us." The Lanes were provided with a press release reflecting that they had relinquished "total control over the corporate stock and other assets."
 
 
 9
 The Panelists then acted decisively and vigorously. They abandoned a product line and streamlined operations and management. They shut down one plant and increased operations at others. The Panel negotiated with creditors who agreed to reduce some of their claims. The Panel implemented a quality control plan as well as a marketing plan. Cash flow stabilized as a result of a contract the Panel negotiated with Tyson Foods. Quality and efficiency improved. The Panel sold one of the divisions for a $3 million profit. In addition, the poultry market stabilized and prices increased about 2 cents per pound from June 1985 to March 1986. Chicken feed costs declined and this decreased the expenses.
 
 
 10
 In May 1986 the Panel, acting as trustees under the trust, sold the Lane Companies stock to Tyson Foods, Inc. for $35 million. Following news of the sale, the Lanes brought suit seeking to rescind their agreement and assume control of the assets, or in the alternative to share in the sale proceeds. The district court denied all relief to the Lanes finding that: (1) the Panel members did not breach any fiduciary duties owed to the Lanes; (2) there was no fraud or other inequitable conduct on the part of the Panel; (3) the transaction, as consummated, reflected the agreement of the parties; (4) adequate consideration existed to support the agreement; and (5) the agreement was not unconscionable. Based on these findings, the court concluded that the Lanes failed to prove that a constructive trust should be imposed on the sale proceeds. On appeal, the Lanes do not attack the district court's interpretation of Arkansas law; instead, they urge that the court's factual findings are incorrect.[6] We review findings of fact under the clearly erroneous standard, giving due regard to the opportunity of the district court to judge the credibility of witnesses. Anderson v. Bessemer City, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) (interpreting Fed.R.Civ.P. 52(a) ). Findings are clearly erroneous if a review of the record as a whole inspires a "definite and firm conviction" that the finding was a mistake. Id. We note that when a district judge's findings are based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error. Id. at 575-76, 105 S.Ct. at 1512-13.
 
 I.
 
 11
 A constructive trust is an equitable remedy which may be imposed if it is shown by clear, cogent and convincing evidence that property is acquired by fraud or breach of a fiduciary duty. Bramlett v. Selman, 268 Ark. 457, 597 S.W.2d 80, 84-85 (1980); Horton v. Koner, 12 Ark.App. 38, 671 S.W.2d 235, 238 (1984). The Lanes do not argue that the Panelists acquired the stock fraudulently; rather, they offer numerous arguments that the district court should have imposed a constructive trust because the Panel breached fiduciary duties owed to the Lanes. The district court did not decide whether the Panel stood in a fiduciary capacity toward the Lanes. Instead, the court reasoned that even if a fiduciary relationship existed, the Panelists breached no duty owed.
 
 A.
 
 12
 The Lanes first argue that a constructive trust should be imposed because the Panelists breached their fiduciary duty by acquiring the stock. They urge that the acquisition was improper because a fiduciary is prohibited from acquiring the property of his principal. Johnson v. Umsted, 64 F.2d 316 (8th Cir.1933); Hindman v. O'Connor, 54 Ark. 627, 16 S.W. 1052 (1891). Despite the terms of the trust which state that the trust is established for the benefit of the company employees, the Lanes contend that the Panelists reserved absolute discretion regarding the distribution of the trust corpus and the transfer was therefore in substance to them. The evidence does not support this claim. The Panelists testified that they have made no final decision on how the proceeds ultimately will be distributed, but that they do not intend to convert the stock for their exclusive benefit and that they only expect to share in the proceeds as 3 of the more than 1000 employees. The district court did not err in concluding that the Panelists did not breach any fiduciary duty by acquiring the stock.
 
 B.
 
 13
 Next, the Lanes contend that a constructive trust should be imposed because the Panelists breached a fiduciary duty by failing to advise them of Tyson Foods' interest in purchasing the Companies. In late June of 1985, Tyson Foods had approached Minger about a possible acquisition of the Lane operations. The district court found, however, that Tyson's "offer to purchase" was merely an interest in operating the Companies for a 60-day period, before determining whether they wanted to purchase the Companies, conditioned on the Lanes being out of the operation. The district court found this disclosure would have served no useful purpose because Clift Lane harbored an intense dislike for Don Tyson and would have suffered bankruptcy rather than sell the operations to him. These findings are fully supported by the record. The district court did not err in concluding that the Panelists' failure to disclose this information resulted in no violation of fiduciary duties.
 
 II.
 
 14
 The Lanes next contend that the district court erred in failing to impose a constructive trust on the sale proceeds because the transaction, as consummated, did not reflect the oral agreement between the parties. The Lanes maintain that it requires a "broad jump of illogical proportions" to say that creating a trust for the benefit of the employees reflected the transaction agreed to, that is, "turning the stock back into the company." The district court found, however, that the stock transfer agreement contained an integration clause, specifically stating that the written agreement set forth the entire agreement and understanding of the parties. Under the terms of the agreement, the Lanes transferred unequivocally all stock and responsibilities of ownership to the Panelists under a Declaration of Trust. Moreover, the district court found that the only variation between the proposal and the transaction was how, once transferred, the stock would be held. The court found this variation to be immaterial because the Lanes wanted only to rid themselves of the duties and responsibilities associated with the direction of the Companies and more specifically, the risk of default and foreclosure on their personal guaranties. These findings are fully supported by the record. Accordingly, the district court did not err in concluding that the transaction as consummated reflected the agreement of the parties.[7]
 
 III.
 
 15
 The Lanes argue that the district court erred in failing to impose a constructive trust on the sale proceeds because the stock transfer was not supported by adequate consideration. Because of the inevitability of default, the Lanes maintain that the Panelists took over the Companies only ten days before they would have been required to under the Plan and that this was therefore insufficient consideration to support their agreement. See St. Louis IM & S Ry. Co. v. Jones, 93 Ark. 537, 125 S.W. 1025 (1910); Crookham and Vessels, Inc. v. Larry Moyer Trucking, Inc., 16 Ark.App. 214, 699 S.W.2d 414, 416 (1985). It was only by turning over the Companies' to the Panelists, however, that the Lanes could hope to shelter their personal assets. In the course of events, the Panelists preserved the Lanes' assets by avoiding liquidation. The Lanes also received a $100,000 consulting agreement.[8] Accordingly, the district court did not err in concluding that adequate consideration existed to support the agreement.[9]
 
 IV.
 
 16
 Finally, the Lanes contend that the district court erred in failing to impose a constructive trust to prevent unjust enrichment of the Panel and employees. See Orsini v. Commercial Nat'l Bank, 6 Ark.App. 166, 639 S.W.2d 516, 518 (1982). The Lanes vigorously contend that the stock had substantial value at the time was transferred and therefore the Panelists were unjustly enriched at their expense. Although the district court noted that it was the opinion of the Panelists that the stock was worthless at the time it was transferred, the court made no specific finding concerning the pre-transfer stock value. On appeal, the Lanes point to no persuasive testimony in the record as to this value.[10] In any event, we cannot conclude there was unjust enrichment here. The Lanes absolved themselves of the bankrupt Companies, in return they received a consulting contract and ultimate relief from foreclosure on their personal guarantees. Moreover, the district court specifically found that without the efforts of the Panel (and the employees), the Companies would have been forced into liquidation. The Panelists assumed the responsibilities of running the Companies. They invested their time, energies and expertise into making the Companies profitable. The district court did not err in failing to impose a constructive trust to prevent unjust enrichment.
 
 V.
 
 17
 The Panelists appeal the district court's denial of their motion for sanctions under Fed.R.Civ.P. 11. The Panelists claim that the court erred in considering only whether the suit was brought in good faith and by applying a subjective good faith standard, rather than the objective standard required by Rule 11. See Adduono v. World Hockey Ass'n, 824 F.2d 617, 621 (8th Cir.1987). These arguments focus on the court's statement "that counsel on behalf of the plaintiffs or the plaintiffs themselves [did not] enter this action other than in good faith * * * as to plaintiffs' contention in the proceeding." This statement was simply in response to the Panelists' most serious allegation that, "from its inception plaintiff's case has been based on lies and fraud" and that "Dorothy Lane filed a false affidavit in order to obtain a temporary restraining order against distribution of the sale proceeds." We are satisfied that the court applied the correct legal standard.
 
 
 18
 Whether a violation of Rule 11 occurs is a matter for the district court to determine, and this determination involves matters of judgment and degree. O'Connell v. Champion Int'l Corp., 812 F.2d 393, 395 (8th Cir.1987). Although finding the case to be "highly controversial and vigorously contested," the court concluded sanctions were not appropriate. This determination rests upon the district court's familiarity with the case, parties and counsel, and deserves our deference. Id. We affirm the district court's denial of Rule 11 sanctions.
 
 
 
 [1]
 The Honorable Oren Harris, United States District Judge, Western District of Arkansas
 
 
 [2]
 Including Lane Processing, Inc., Dexter Farms, Dexter Processing, Inc. and Lane Poultry of Carolina, Inc
 
 
 [3]
 Including a $2.2 million loss in June alone
 
 
 [4]
 According to Covell, the Panel determined that it was imperative for the Lanes to surrender their ownership; otherwise they could assert their power to defeat any program implemented by the Panel
 
 
 [5]
 The only controversy arising at this meeting was Clift Lane's concern about his consulting agreement. After a brief conference with Mrs. Lane, he signed the agreement
 
 
 [6]
 The Lanes also claim that federal and Arkansas law require this court to apply a de novo standard of review. The standard of review applied by this court is governed by Fed.R.Civ.P. 52(a), which requires this court to apply the clearly erroneous standard. See Jackson v. Hartford Accident and Indem. Co., 422 F.2d 1272, 1275-76 (8th Cir.1970) (concurring op.), cert. denied, 400 U.S. 855, 91 S.Ct. 86, 27 L.Ed.2d 92 (1970) (discussing effects of Rule 52(a) in equity appeals)
 
 
 [7]
 For similar reasons, we reject the Lanes' claim that the stock transfer is void because the Lanes transferred the stock to an unknown party. Curlee v. Morris, 196 Ark. 779, 120 S.W.2d 10 (1938). The Lanes' reliance on Curlee is misplaced. In Curlee, the defect that led to the invalidity of the deed was not that the grantor was never informed of the potential grantee; rather it was that the instrument was incomplete. See Treece v. Treece, 212 Ark. 294, 205 S.W.2d 711, 714 (1947)
 
 
 [8]
 The fact that the consulting contract was between the Lanes and the Lane Companies rather than the Panel members is of no consequence; consideration need not move directly between the parties but may move from one promisor to a third person and vice versa. Quattlebaum v. Gray, 252 Ark. 610, 480 S.W.2d 339, 341 (1972)
 
 
 [9]
 Along similar lines, the Lanes argue that it would be unconscionable for any court to enforce the contract. See Davis v. Kolb, 263 Ark. 158, 563 S.W.2d 438, 438-39 (1978) (applying unconscionability provision of the Uniform Commercial Code). They maintain that after having borne the pressures and hardship of the operations over the past thirty-five years for them to forfeit their interest merely in exchange for ten days before the same result would have occurred under the Plan would produce an unconscionable result. As discussed above, the district court found that the Lanes received much more than ten days of relief from running the Companies. Additionally, competent adults may make contracts on their own terms, provided they are neither illegal nor contrary to public policy, and in the absence of fraud, mistake, or duress a party who has fairly and voluntarily entered into such a contract is bound thereby, notwithstanding it was unwise or disadvantageous to him. Annotation, "Unconscionabilty" As a Ground for Refusing Enforcement of Contract for Sale of Goods or Agreement Collateral Thereto. 18 A.L.R.3d 1305 (1968). We therefore reject this argument
 
 
 [10]
 The Lanes claim that the testimony of Bo Pilgram supports their position that the stock had substantial value at the time it was transferred to the Panel insofar as "a few weeks prior to the takover he offered to pay $10 million for the Companies." The district court, however, rejected Pilgram's testimony finding his credibility to be tainted and his testimony biased. The Lanes also claim that the testimony of Don Armbrust supports their position that the Companies had a positive net worth. The district court, however, found Armbrust's testimony to be unpersuasive